Filed:  March 7, 2014

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

**No. 13-1430**

—————————

(8:09-md-02083-RWT,  8:09-cv-00744-RWT,  8:09-cv-02739-RWT,  8:09-cv-02740-RWT,  8:09-cv-02741-RWT,  8:09-cv-02742-RWT,  8:09-cv-02743-RWT,  8:09-cv-02744-RWT,  8:09-cv-02745-RWT,  8:09-cv-02746-RWT,  8:09-cv-02747-RWT,  8:09-cv-02748-RWT,  8:09-cv-02749-RWT,  8:09-cv-02750-RWT,  8:09-cv-02979-RWT,  8:09-cv-02980-RWT,  8:09-cv-02981-RWT,  8:09-cv-02982-RWT,  8:09-cv-02983-RWT,  8:09-cv-02984-RWT,  8:09-cv-02985-RWT,  8:09-cv-02986-RWT,  8:09-cv-02987-RWT,  8:09-cv-03299-RWT,  8:09-cv-03300-RWT,  8:09-cv-03301-RWT,  8:09-cv-03302-RWT,  8:09-cv-03303-RWT,  8:09-cv-03304-RWT,  8:09-cv-03305-RWT,  8:09-cv-03306-RWT,  8:09-cv-03307-RWT,  8:09-cv-03308-RWT,  8:09-cv-03309-RWT,  8:09-cv-03310-RWT,  8:09-cv-03311-RWT,  8:09-cv-03312-RWT,  8:09-cv-03313-RWT,  8:09-cv-03314-RWT,  8:09-cv-03315-RWT,  8:09-cv-03316-RWT,  8:10-cv-00388-RWT,  8:10-cv-00389-RWT,  8:10-cv-00390-RWT,  8:10-cv-00814-RWT,  8:10-cv-00815-RWT,  8:10-cv-00836-RWT,  8:10-cv-01160-RWT,  8:11-cv-00336-RWT,  8:11-cv-00337-RWT,  8:11-cv-00338-RWT,  8:11-cv-01092-RWT,  8:11-cv-02634-RWT,  8:11-cv-02635-RWT,  8:11-cv-03292-RWT,  8:11-cv-03542-RWT, 8:12-cv-03070-RWT)

—————————

In re: KBR, INCORPORATED, Burn Pit Litigation.

-------------------------

ALAN  METZGAR;  PAUL  PARKER;  RICHARD  RONALD  GUILMETTE;
WILLIAM  G.  BRISTER,  JR.;  HENRY  J.  O'NEILL;  MICHAEL  AUW;
CORY  CASALEGNO;  MICHAEL  DOUGLAS  MOORE;  DAVID  U.  LACKEY;
RANDALL  L.  ROBINSON;  DEAN  GUY  OLSON;  ALBERT  PAUL  BITTEL,
III;  FRED  ROBERT  ATKINSON,  JR.;  ROBYN  SACHS,  personal
representative  of  Christopher  Sachs,  deceased;  JENNIFER
MONTIJO;  STEPHEN  FLOWERS;  JOANNE  OCHS;  MELISSA  OCHS;  JAMES
MORGAN;  DAVID  NEWTON;  CHRIS  BOGGIANO;  EARL  CHAVIS;  BENNY
LYLE  REYNOLDS;  JOSHUA  ELLER;  ROBERT  CAIN;  CRAIG  HENRY;
FRANCIS  JAEGER;  DAVID  MCMENOMY;  MARK  POSZ;  EL  KEVIN  SAR;
SMSgt.  GLEN  S.  MASSMAN;  SSgt.  WENDY  L.  MCBREAIRTY;  PABLO
BERCHINI;  BRIAN  P.  ROBINSON;  MAURICE  CALLUE;  DENNIS  WAYNE
BRIGGS;  EDWARD  LEE  BUQUO;  WAYNE  E.  FABOZZI;  SHARLENE  S.
JAGGERNAUTH;  FLOYD  JAMES  JOHNSON,  SR.;  TAMRA  C.  JOHNSON;

RICHARD LEE KEITH; DANIEL SANTIAGO MORALES; PHILLIP MCQUILLAN; ILDEBBRANDO PEREZ; LUIGI ANTONIO PROVENZA; RUTH ANN REECE; EDUARDO SAAVEDRA, SR.; JILL R. WILKINS, personal representative of Kevin E. Wilkins, deceased; MICHAEL DONNELL WILLIAMS; JERMAINE LYNELL WRIGHT; EDWARD ADAMS; KENNETH BALDWIN; DONNA WU; JOHN DOES 1-1000; JANE DOES 1-1000; WALLACE MCNABB; KEVIN PAUL ROBBINS; BRIAN BLUMLINE; ROBERT BIDINGER; UNKNOWN PARTIES; BENJAMIN BOEKE; CRAIG KERVIN; BARRY ZABIELINSKI; DAVID GREEN; NICK DANIEL HEISLER; DERROL A. TURNER; VINCENT C. MOSELEY; ALEX HARLEY; JOHN A. WESTER, JR.; BILL JACK CARLISLE, JR.; ANTHONY EDWARD ROLES; MARCOS BARRANCO; JOEL LUGO; SHAWN THOMAS SHERIDAN; JAYSON WILLIAMS; EUNICE RAMIREZ; LEE WARREN JELLISON, JR.; GEORGE LUNDY; THOMAS KELLECK; DAN BOWLDS; TONY ALLEN GOUCKENOUR; JOHN WILLIAM JACKSON; JOHN PETE TROOST; DEBORAH ANN WHEELOCK; CHARLES HICKS; SEAN ALEXANDER STOUGH; JEFFREY MORGAN COX; JAMES WARREN GARLAND; DANNY LAPIERRE; KENNETH HARRIS; ANTHONY JEROME WILLIAMS; KATHY VINES; PATRICK CASSIDY; WILLIAM BARRY DUTTON; CHRISTOPHER MICHAEL KOZEL; RICHARD MCANDREW; LORENZO PEREZ; JESSEY JOSEPH PHILIP BACA; DANIEL TIJERNIA; HEINZ ALEX DISCH; JAMES MCCOLLEM; TRAVIS FIDELL PUGH; ANTHONY RAY JOHNSON; DAVID MICHAEL ROHMFELD; JOSHUA DAVID BEAVERS; MATTHEW JOEL FIELDS; STEVEN E. GARDNER; STEPHEN R. JONES; KEVIN SCOTT TEWES; HANS NICOLAS YU; THOMAS OLSON; BRIAN PAULUS; PAUL MICHAEL WIATR; MICHAEL FOTH; BRETT ANTHONY MAZZARA; LISA ROUNDS, Personal representative of Andrew Ray Rounds, deceased; DAVID ROUNDS, Personal representative of Andrew Ray Rounds, deceased; PETER BLUMER; SCOTT ANDREW CHAMBERLAIN; TIMOTHY E. DIMON; WILLIAM PHILIP KRAWCZYK, SR.; SEAN JOHNSON; SHERRY BISHOP, Individually and as representative of the estate of Kirk A. Bishop; GENE BISHOP; PATRICK BISHOP; ALBERT JOHNSON, JR.; DAVID JOBES; GENE LEONARD MATSON; TIMOTHY J. WATSON; ANDREW MASON; MICHELLE BROWN; JONATHAN LYNN; CHARLES KINNEY; MICHAEL MCCLAIN; BASIL SALEM; JUSTIN GONZALES; MATTHEW GUTHERY; CHRISTOPHER LIPPARD; DAVID PARR; JOHN F. MONAHAN; AMANDA BRANNON; L. CHANDLER BRANNON, and all others similarly situated,

Plaintiffs - Appellants,

v.

KBR, INCORPORATED; KELLOGG BROWN & ROOT, LLC; HALLIBURTON COMPANY; KELLOGG BROWN & ROOT SERVICES, INCORPORATED; BROWN AND ROOT SERVICES; DII INDUSTRIES, LLC; HALLIBURTON ENERGY

2

SERVICES, INC.; KBR HOLDINGS, LLC; KELLOGG BROWN & ROOT, INCORPORATED; KELLOGG BROWN & ROOT INTERNATIONAL, INCORPORATED; KBR GROUP HOLDINGS INCORPORATED; KBR TECHNICAL SERVICES, INCORPORATED,

    Defendants – Appellees,

  and

ERKA LTD,

    Defendant.

_____

O R D E R

_____

The Court amends its opinion filed March 6, 2014, as follows:

On page 29, footnote 5, line 2, the spelling of the word "exception" is corrected.

      For the Court – By Direction


      /s/ Patricia S. Connor
        Clerk

In re: KBR, INCORPORATED, Burn Pit Litigation

--------------------------

ALAN METZGAR; PAUL PARKER; RICHARD RONALD GUILMETTE;
WILLIAM G. BRISTER, JR.; HENRY J. O'NEILL; MICHAEL AUW;
CORY CASALEGNO; MICHAEL DOUGLAS MOORE; DAVID U. LACKEY;
RANDALL L. ROBINSON; DEAN GUY OLSON; ALBERT PAUL BITTEL,
III; FRED ROBERT ATKINSON, JR.; ROBYN SACHS, personal
representative of Christopher Sachs, deceased; JENNIFER
MONTIJO; STEPHEN FLOWERS; JOANNE OCHS; MELISSA OCHS; JAMES
MORGAN; DAVID NEWTON; CHRIS BOGGIANO; EARL CHAVIS; BENNY
LYLE REYNOLDS; JOSHUA ELLER; ROBERT CAIN; CRAIG HENRY;
FRANCIS JAEGER; DAVID MCMENOMY; MARK POSZ; EL KEVIN SAR;
SMSgt. GLEN S. MASSMAN; SSgt. WENDY L. MCBREAIRTY; PABLO
BERCHINI; BRIAN P. ROBINSON; MAURICE CALLUE; DENNIS WAYNE
BRIGGS; EDWARD LEE BUQUO; WAYNE E. FABOZZI; SHARLENE S.
JAGGERNAUTH; FLOYD JAMES JOHNSON, SR.; TAMRA C. JOHNSON;
RICHARD LEE KEITH; DANIEL SANTIAGO MORALES; PHILLIP
MCQUILLAN; ILDEBBRANDO PEREZ; LUIGI ANTONIO PROVENZA; RUTH
ANN REECE; EDUARDO SAAVEDRA, SR.; JILL R. WILKINS, personal
representative of Kevin E. Wilkins, deceased; MICHAEL
DONNELL WILLIAMS; JERMAINE LYNELL WRIGHT; EDWARD ADAMS;
KENNETH BALDWIN; DONNA WU; JOHN DOES 1-1000; JANE DOES
1-1000; WALLACE MCNABB; KEVIN PAUL ROBBINS; BRIAN BLUMLINE;
ROBERT BIDINGER; UNKNOWN PARTIES; BENJAMIN BOEKE; CRAIG
KERVIN; BARRY ZABIELINSKI; DAVID GREEN; NICK DANIEL
HEISLER; DERROL A. TURNER; VINCENT C. MOSELEY; ALEX HARLEY;
JOHN A. WESTER, JR.; BILL JACK CARLISLE, JR.; ANTHONY
EDWARD ROLES; MARCOS BARRANCO; JOEL LUGO; SHAWN THOMAS
SHERIDAN; JAYSON WILLIAMS; EUNICE RAMIREZ; LEE WARREN
JELLISON, JR.; GEORGE LUNDY; THOMAS KELLECK; DAN BOWLDS;
TONY ALLEN GOUCKENOUR; JOHN WILLIAM JACKSON; JOHN PETE
TROOST; DEBORAH ANN WHEELOCK; CHARLES HICKS; SEAN ALEXANDER
STOUGH; JEFFREY MORGAN COX; JAMES WARREN GARLAND; DANNY
LAPIERRE; KENNETH HARRIS; ANTHONY JEROME WILLIAMS; KATHY
VINES; PATRICK CASSIDY; WILLIAM BARRY DUTTON; CHRISTOPHER
MICHAEL KOZEL; RICHARD MCANDREW; LORENZO PEREZ; JESSEY

JOSEPH PHILIP BACA; DANIEL TIJERNIA; HEINZ ALEX DISCH; JAMES MCCOLLEM; TRAVIS FIDELL PUGH; ANTHONY RAY JOHNSON; DAVID MICHAEL ROHMFELD; JOSHUA DAVID BEAVERS; MATTHEW JOEL FIELDS; STEVEN E. GARDNER; STEPHEN R. JONES; KEVIN SCOTT TEWES; HANS NICOLAS YU; THOMAS OLSON; BRIAN PAULUS; PAUL MICHAEL WIATR; MICHAEL FOTH; BRETT ANTHONY MAZZARA; LISA ROUNDS, Personal representative of Andrew Ray Rounds, deceased; DAVID ROUNDS, Personal representative of Andrew Ray Rounds, deceased; PETER BLUMER; SCOTT ANDREW CHAMBERLAIN; TIMOTHY E. DIMON; WILLIAM PHILIP KRAWCZYK, SR.; SEAN JOHNSON; SHERRY BISHOP, Individually and as representative of the estate of Kirk A. Bishop; GENE BISHOP; PATRICK BISHOP; ALBERT JOHNSON, JR.; DAVID JOBES; GENE LEONARD MATSON; TIMOTHY J. WATSON; ANDREW MASON; MICHELLE BROWN; JONATHAN LYNN; CHARLES KINNEY; MICHAEL MCCLAIN; BASIL SALEM; JUSTIN GONZALES; MATTHEW GUTHERY; CHRISTOPHER LIPPARD; DAVID PARR; JOHN F. MONAHAN; AMANDA BRANNON; L. CHANDLER BRANNON, and all others similarly situated

   Plaintiffs - Appellants,

    v.

KBR, INCORPORATED; KELLOGG BROWN & ROOT, LLC; HALLIBURTON COMPANY; KELLOGG BROWN & ROOT SERVICES, INCORPORATED; BROWN AND ROOT SERVICES; DII INDUSTRIES, LLC; HALLIBURTON ENERGY SERVICES, INC.; KBR HOLDINGS, LLC; KELLOGG BROWN & ROOT, INCORPORATED; KELLOGG BROWN & ROOT INTERNATIONAL, INCORPORATED; KBR GROUP HOLDINGS INCORPORATED; KBR TECHNICAL SERVICES, INCORPORATED,

   Defendants – Appellees,

  and

ERKA LTD,

   Defendant.

———————————

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Roger W. Titus, Senior District Judge. (8:09-md-02083-RWT, 8:09-cv-00744-RWT, 8:09-cv-02739-RWT, 8:09-cv-02740-RWT, 8:09-cv-02741-RWT, 8:09-cv-02742-RWT, 8:09-cv-02743-RWT, 8:09-cv-02744-RWT, 8:09-cv-02745-RWT, 8:09-cv-02746-RWT, 8:09-cv-02747-RWT, 8:09-cv-02748-RWT, 8:09-cv-02749-RWT, 8:09-cv-02750-RWT, 8:09-cv-02979-RWT, 8:09-cv-02980-RWT, 8:09-cv-02981-RWT, 8:09-cv-02982-RWT, 8:09-cv-02983-RWT, 8:09-cv-02984-RWT, 8:09-cv-02985-RWT, 8:09-cv-02986-RWT, 8:09-cv-02987-RWT, 8:09-cv-03299-RWT, 8:09-cv-03300-RWT, 8:09-cv-03301-RWT, 8:09-cv-03302-RWT, 8:09-cv-03303-RWT, 8:09-cv-03304-RWT, 8:09-cv-03305-RWT, 8:09-cv-03306-RWT, 8:09-cv-03307-RWT, 8:09-cv-03308-RWT, 8:09-cv-03309-RWT, 8:09-cv-03310-RWT, 8:09-cv-03311-RWT, 8:09-cv-03312-RWT, 8:09-cv-03313-RWT, 8:09-cv-03314-RWT, 8:09-cv-03315-RWT, 8:09-cv-03316-RWT, 8:10-cv-00388-RWT, 8:10-cv-00389-RWT, 8:10-cv-00390-RWT, 8:10-cv-00814-RWT, 8:10-cv-00815-RWT, 8:10-cv-00836-RWT, 8:10-cv-01160-RWT, 8:11-cv-00336-RWT, 8:11-cv-00337-RWT, 8:11-cv-00338-RWT, 8:11-cv-01092-RWT, 8:11-cv-02634-RWT, 8:11-cv-02635-RWT, 8:11-cv-03292-RWT, 8:11-cv-03542-RWT, 8:12-cv-03070-RWT)

---

Argued: October 30, 2013                    Decided: March 6, 2014

---

Before DIAZ and FLOYD, Circuit Judges, and Joseph F. ANDERSON, Jr., United States District Judge for the District of South Carolina, sitting by designation.

---

Vacated and remanded by published opinion. Judge Floyd wrote the opinion, in which Judge Diaz and Judge Anderson have joined.

---

**ARGUED**: Susan L. Burke, BURKE PLLC, Washington, D.C., for Appellants. Robert A. Matthews, MCKENNA LONG & ALDRIDGE LLP, Washington, D.C., for Appellees. **ON BRIEF**: Joseph Rice, Frederick C. Baker, James W. Ledlie, MOTLEY & RICE, LLP, Mt. Pleasant, South Carolina, for Appellants. Raymond B. Biagini, Daniel L. Russell, Jr., Shannon G. Konn, MCKENNA LONG & ALDRIDGE LLP, Washington, D.C., for Appellees.

---

FLOYD, Circuit Judge:

Since the United States began its military operations in Afghanistan and Iraq in 2001 and 2003, respectively, its use of private contractors to support its mission has risen to "unprecedented levels." Comm'n on Wartime Contracting in Iraq and Afghanistan, At What Risk? Correcting Over-Reliance on Contractors in Contingency Operations 1 (Feb. 24, 2011) (laying out the findings of a bipartisan congressional commission). At times, the number of contract employees has exceeded the number of military personnel alongside whom they work in these warzones. Id. Courts—including this Court—have struggled with how to treat these contractors under the current legal framework, which protects government actors but not private contractors from lawsuits in some cases. See, e.g., Boyle v. United Techs. Corp., 487 U.S. 500 (1988); Harris v. Kellogg Brown & Root Servs., Inc., 724 F.3d 458 (3d Cir. 2013); Taylor v. Kellogg Brown & Root Servs., Inc., 658 F.3d 402 (4th Cir. 2011); Saleh v. Titan Corp., 580 F.3d 1 (D.C. Cir. 2009); Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271 (11th Cir. 2009). This case requires us to make another contribution to this changing legal landscape.

Appellees are companies that contracted with the United States government to provide certain services at military bases

4

in Iraq and Afghanistan, including waste disposal and water treatment. Appellants contend that they suffered harm as a result of the contractors' waste disposal and water treatment practices and brought state tort and contract claims to seek redress for their alleged injuries. Prior to discovery, the district court dismissed Appellants' claims, holding that (1) the claims were nonjusticiable, (2) the contractors were immune from suit, and (3) federal law preempted the state tort laws underlying Appellants' claims. Because the district court lacked the information necessary to dismiss Appellants' claims on these bases, we vacate the district court's decision and remand this case for further proceedings consistent with this opinion.

## I.

The Army contracted with Appellees KBR, Inc.; Kellogg Brown & Root LLC; Kellogg Brown & Root Services, Inc.; and Halliburton (collectively, KBR) to provide waste disposal and water treatment services on military bases in Iraq and Afghanistan. In fifty-eight separate complaints, Appellants—the majority of whom are United States military personnel—(Servicemembers) brought various state tort and contract claims, including the following causes of action: negligence; battery; nuisance; negligent and intentional infliction of emotional distress;

5

willful and wanton conduct; negligent hiring, training, and supervision; breach of duty to warn; breach of contract; and wrongful death. Many of the pending cases are purported class actions. The Servicemembers contend that they suffered injuries as a result of KBR's waste disposal and water treatment practices. According to the Servicemembers, these injuries occurred because KBR "violated military directives in its performance of waste disposal and water treatment services" and breached LOGCAP III—its contract with the government.

"LOGCAP" stands for "Logistics Civil Augmentation Program." Under that program, which the Army established in 1985, "civilian contractors [may] perform selected services in wartime to augment Army forces" and "release military units for other missions or fill shortfalls." Army Reg. 700-137, at 1-1 (Dec. 16, 1985). On December 14, 2001, the Army awarded the LOGCAP III contract to KBR. LOGCAP III is a ten-year contract that governs a wide array of services on military bases in Iraq, Afghanistan, Kuwait, Djibouti, Jordan, Kenya, Uzbekistan, and Georgia, including waste disposal, water treatment, and other vital services. The military executes LOGCAP III through various "task orders" that incorporate "statements of work," which define KBR's responsibilities.

In their First Amended Complaint, the Servicemembers contend that KBR violated LOGCAP III's waste management and

water treatment components in two major ways. First, the Servicemembers allege that KBR failed to properly handle and incinerate waste by "burn[ing] vast quantities of unsorted waste in enormous open air burn pits with no safety controls" from 2003 to the present. They aver that the burned waste included trucks, tires, rubber, batteries, Styrofoam, metals, petroleum, chemicals, medical waste, biohazard materials, human remains, asbestos, and hundreds of thousands of plastic water bottles. A report that the Department of Defense presented to Congress identifies many of these items as "prohibited from burning." Dep't of Defense, Report to Congress on the Use of Open-Air Burn Pits by the United States Armed Forces 6 (Apr. 28, 2010). According to the Servicemembers, the smoke from these burn pits contained "carcinogens and respiratory sensitizers . . ., creating a severe health hazard [and] potentially causing both acute and chronic health problems." Second, the Servicemembers contend that KBR provided contaminated water to military forces. Specifically, they argue that KBR did not perform water quality tests or ensure that water contained proper levels of chlorine residual.

On October 16, 2009, the Judicial Panel on Multidistrict Litigation transferred all of the cases to the District of Maryland for consolidated pretrial proceedings. KBR filed its first motion to dismiss for lack of subject matter jurisdiction

7

under Federal Rule of Civil Procedure 12(b)(1) on January 29, 2010. KBR argued that (1) the Servicemembers' claims are nonjusticiable under the political question doctrine; (2) KBR is entitled to "derivative sovereign immunity" based on the "discretionary function" exception to the federal government's waiver of immunity in the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671 et seq.; and (3) the FTCA's "combatant activities" exception preempts the state tort laws underlying the Servicemembers' claims. The district court denied the first motion to dismiss without prejudice, concluding that it did not have enough information to decide whether to dismiss for lack of subject matter jurisdiction. See In re KBR, Inc., Burn Pit Litig. (Burn Pit I), 736 F. Supp. 2d 954, 957 (D. Md. 2010). The court found that the political question doctrine, derivative sovereign immunity, and the combatant activities exception did not compel dismissal based on the facts alleged in the complaint. However, due to its concern about unleashing "the full fury of unlimited discovery" on "government contractors operating in war zones," the court asked the parties to submit a joint discovery plan for limited jurisdictional discovery. Id. at 979.

On December 10, 2010, the district court stayed the proceedings in this case in light of the Fourth Circuit's pending decisions in Al-Quraishi v. L-3 Services, Inc., 657 F.3d

8

201 (4th Cir. 2011), Al Shimari v. CACI International, Inc., 658 F.3d 413 (4th Cir. 2011), and Taylor v. Kellogg Brown & Root Services, Inc., 658 F.3d 402. This Court ultimately dismissed Al-Quraishi and Al Shimari after a rehearing en banc because the cases were not subject to interlocutory appeal under the collateral order doctrine. See Al Shimari v. CACI Int'l, Inc., 679 F.3d 205 (4th Cir. 2012) (en banc). Taylor concerns how to treat military contractors under the political question doctrine.

Following the resolution of these appeals and before any jurisdictional discovery took place, KBR filed a renewed motion to dismiss for lack of subject matter jurisdiction. KBR appended twenty-three new exhibits to the renewed motion to dismiss, and the Servicemembers appended two new declarations from military officials to their opposition to KBR's motion. In light of Taylor, briefs that the United States filed in Al Shimari and Saleh v. Titan Corp., and the Supreme Court's decision in Filarsky v. Delia, 132 S. Ct. 1657 (2012), the district court granted KBR's motion to dismiss. In re KBR, Inc., Burn Pit Litig. (Burn Pit II), 925 F. Supp. 2d 752, 772-73 (D. Md. 2013). The court held that the political question doctrine, derivative sovereign immunity, and the combatant activities exception each provided a basis on which to dismiss the Servicemembers' claims.

9

The Servicemembers now appeal, contending that the district court erred in granting the motion to dismiss. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

On appeal from a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), "[w]e review the district court's factual findings with respect to jurisdiction for clear error and the legal conclusion that flows therefrom de novo." Velasco v. Gov't of Indon., 370 F.3d 392, 398 (4th Cir. 2004). "[W]hen a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss, the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Id.; see also Williams v. United States, 50 F.3d 299, 304 (4th Cir. 1995) (noting that "the court may consider the evidence beyond the scope of the pleadings to resolve factual disputes concerning jurisdiction"). However, "when the jurisdictional facts are inextricably intertwined with those central to the merits, the [district] court should resolve the relevant factual disputes only after appropriate discovery." Kerns v. United States, 585 F.3d 187, 193 (4th Cir. 2009).

10

A.  Political Question Doctrine Background

We turn first to KBR's argument that the political question doctrine renders the Servicemembers' claims nonjusticiable.  A claim presents a political question when the responsibility for resolving it belongs to the legislative or executive branches rather than to the judiciary.  See Baker v. Carr, 369 U.S. 186, 210 (1962) ("The nonjusticiability of a political question is primarily a function of the separation of powers.").  The political question doctrine prevents the courts from encroaching on issues that the Constitution assigns to these other branches or that the judiciary is ill-equipped to decide.  See id. at 217.  However, in determining whether the questions that this case presents belong to another branch of government, we remain mindful of the fact that "[i]t is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803).

"[M]ost military decisions lie solely within the purview of the executive branch."  Taylor, 658 F.3d at 407 n.9.  As this Court explained in Lebron v. Rumsfeld, 670 F.3d 540 (4th Cir. 2012), "the Constitution delegates authority over military affairs to Congress and to the President as Commander in Chief. It contemplates no comparable role for the judiciary. . . . [J]udicial review of military decisions would stray from the

11

traditional subjects of judicial competence." Id. at 548. However, "acting under orders of the military does not, in and of itself, insulate the claim from judicial review." Taylor, 658 F.3d at 411. Therefore, although cases involving military decision making often fall in the political question box, we cannot categorize such a case as nonjusticiable without delving into the circumstances at issue.

The Supreme Court announced a six-factor test for assessing whether a claim poses a political question in Baker v. Carr. Pursuant to Baker, cases involving political questions evince (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department," (2) "a lack of judicially discoverable and manageable standards for resolving" the issue, (3) "the impossibility of deciding [the issue] without an initial policy determination of a kind clearly for nonjudicial discretion," (4) "the impossibility of a court's undertaking independent resolution [of the issue] without expressing lack of the respect due coordinate branches of government," (5) an "unusual need for unquestioning adherence to a political decision already made," or (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." Id. at 217.

This Court considered whether examining a government contractor's actions can invoke a political question in Taylor.

12

In doing so, the Court adapted Baker to the government contractor context through a new two-factor test. Under the Taylor test, we first consider "the extent to which [the government contractor] was under the military's control." 658 F.3d at 411. Second, we evaluate "whether national defense interests were closely intertwined with the military's decisions governing [the government contractor's] conduct." Id. Pursuant to the second factor, the political question doctrine renders a claim nonjusticiable if deciding the issue "would require the judiciary to question 'actual, sensitive judgments made by the military,'" which can occur even if the government contractor is "nearly insulated from direct military control." Id. (quoting Taylor v. Kellogg Brown & Root Servs., Inc., No. 2:09cv341, 2010 WL 1707530, at *5 (E.D. Va. Apr. 19, 2010)). In evaluating the Taylor factors, we "look beyond the complaint, [and] consider [] how [the Servicemembers] might prove [their] claim[s] and how KBR would defend." Id. at 409 (first and second alterations in original) (quoting Lane v. Halliburton, 529 F.3d 548, 565 (5th Cir. 2008)) (internal quotation marks omitted).

In Taylor, this Court determined whether the political question doctrine barred a Marine's negligence suit against a government contractor. The Marine—Peter Taylor—was electrocuted and suffered severe injuries when the government contractor's employee turned on a generator at a military base in Iraq

13

despite Marine Corps' instructions not to do so. Id. at 404. When considering the first factor, the Court held that the government contractor was not under the military's control because its contract specified that "the contractor shall have exclusive supervisory authority and responsibility over employees." Id. at 411 (internal quotation marks omitted). However, when considering the second Taylor factor, the Court explained that assessing the government contractor's contributory negligence defense would require it to evaluate Taylor's conduct and certain military decisions, such as the military's choice to employ a generator. Id. at 411-12. The Court therefore determined that "an analysis of [the contractor's] contributory negligence defense would 'invariably require the Court to decide whether . . . the Marines made a reasonable decision.'" Id. at 411 (second alteration in original) (quoting Taylor, 2010 WL 1707530, at *6). Accordingly, based on the second factor alone, this Court opted to affirm the district court's decision to dismiss the case. Id. at 412. The Court's analysis suggests that, if a case satisfies either factor, it is nonjusticiable under the political question doctrine.

Although the Court evaluated Taylor's claim under the new two-factor test, it did not ignore the traditional Baker analysis. In a footnote, the Court noted that considering

14

whether the Marines' actions contributed to Taylor's injuries "would run afoul of the second and fourth Baker factors":

> Here, we have no discoverable and manageable standards for evaluating how electric power is supplied to a military base in a combat theatre or who should be authorized to work on the generators supplying that power. Furthermore, any such judicial assessment thereof would show a lack of respect for the executive branch.

Id. n.13. The Court added this analysis so it could compare the factual scenario at issue in Taylor to the circumstances underlying this Court's earlier decision in Tiffany v. United States, 931 F.2d 271 (4th Cir. 1991)—a case that utilized the Baker factors. This comparison simply bolstered the decision that the Court had already reached using the new two-factor test; the Court did not rely on a Baker-style analysis to arrive at its conclusion. We therefore proceed with our analysis in this case using only the Taylor test.

### B. "Military Control" Factor

The district court concluded that both Taylor factors counseled in favor of finding that the political question doctrine rendered the Servicemembers' claims nonjusticiable. With respect to the first Taylor factor, the district court found that the military made the decision to use burn pits and chose where to locate them. Burn Pit II, 925 F. Supp. 2d at 761-62 & n.14. The court based this determination on the

15

declarations of various military officers and civilians and a letter from General David Petraeus, which states, "There is and will continue to be a need for burn pits during contingency operations." Id. at 762 (internal quotation marks omitted). The court also found that the military controlled water supply operations in Iraq and Afghanistan, a determination it made based on the declarations of two military officers and two Army publications. Id. at 762-63. Finally, the court concluded that, contrary to the contract at issue in Taylor, LOGCAP III and certain task orders related to burn pits and water treatment "demonstrate[d] pervasive and plenary military control" over the functions at issue in this case. Id. at 764. The district court therefore held that the first Taylor factor "weigh[ed] heavily in favor of dismissing the[] cases." Id.

The Servicemembers object to the district court's conclusion that the military controlled KBR and, therefore, contend that this case does not satisfy the first Taylor factor. With regard to the burn pit component of their claims, the Servicemembers aver that the record contains evidence indicating that the military decided to use a burn pit at only a single military base: Camp Taji in Iraq. Accordingly, the Servicemembers argue that any other surface burning occurred without military authorization. The Servicemembers further contend that the Overseas Environmental Baseline Guidance

16

Document supports their argument because it specifies that "[o]pen burning will not be the regular method of solid waste disposal." Dep't of Defense, DoD 4715.5-G, Overseas Environmental Baseline Guidance Document ¶ C7.3.14 (March 2000).

According to a report that the Department of Defense presented to Congress, open-air burn pits are an acceptable method of waste disposal on military bases. Dep't of Defense, Report to Congress on the Use of Open-Air Burn Pits by the United States Armed Forces 4 (Apr. 28, 2010). However, the report makes clear that burn pits are not the preferred method of waste disposal, and the military should utilize them only after exhausting other options, such as landfills and incinerators. Id. In any event, "the decision to use burn pits in deployed operations is retained at operational command level, based on local conditions and in accordance with higher level guidance." Id. at 4-5 (footnotes omitted). The report notes that "[t]he operational commander shall develop and approve a solid waste management plan for the contingency operation," and "[t]he use of open-air burn pits shall not be allowed unless included within this plan." Id. at 5 n.5 (internal quotation marks omitted). An "operational commander" is the senior commander of a Joint Task Force or deployed force. Id.

Various task orders associated with LOGCAP III mesh with the report's description of surface burning as a waste disposal

17

method that the military authorized but discouraged. Iraq Task Orders 139 and 159 specifically mention "surface burning" as a permitted method of waste disposal, although these task orders allow KBR to engage in surface burning only "[u]pon formal notification" and indicate that surface burning is not the preferred method of waste disposal. Afghanistan Task Order 13 places certain limitations on "[t]rash burning," and Afghanistan Task Orders 14 and 98 specify that KBR "shall provide trash pick up and disposal service," including "the operation of a burn pit." Pursuant to Afghanistan Task Order 113, KBR "shall operate and maintain the burn pit . . . until provision of a[n] . . . incinerator." Iraq Task Orders 116, 118, and 145 and Afghanistan Task Order 97 direct KBR to perform general waste management tasks but do not specifically mention surface burning or burn pits.

Declarations from various military officials and civilians indicate that the military decided what method of waste disposal to use on bases in Iraq and Afghanistan. Major Tara Hall, who served as the Army's Chief of Preventive Medicine and Force Health Protection Officer for the Multi-National Corps-Iraq, stated that "the Army decided which method of waste disposal to use at military bases in Iraq. KBR did not decide which methods of waste disposal were appropriate in the contingency environment of Iraq." According to Gerald E. Vincent, a

civilian who served as Environmental Program Manager for the Multi-National Corps-Iraq, "the U.S. military made the decisions about which method of waste disposal to use at each base camp in Iraq . . . . When appropriate, . . . KBR personnel would provide input in the decision[-]making process leading to the decisions about which method of waste disposal would be used." Dr. R. Craig Postlewaite, Acting Director of Force Health Protection and Readiness Programs and Director of Force Readiness and Health Assurance, explained that "the U.S. military, as a matter of policy and doctrine, decides which methods of waste disposal, e.g., burn pits or incinerators, to use at military camps in such war theaters, including Iraq and Afghanistan." He went on to state that "the U.S. military decides where to locate burn pits at such camps" and "[t]he U.S. military also controls what items or substances may be disposed of in burn pits at military camps in these theaters of war." In sum, this evidence indicates that the military allowed the use of burn pits and decided whether, when, and how to utilize them.

Although some evidence demonstrates that the military exercised control over KBR's burn pit activities, the Servicemembers presented evidence—which the district court did not discuss—contradicting this picture. A military guidance document regarding LOGCAP, which the Servicemembers appended to their memorandum in opposition to KBR's first motion to dismiss,

19

explains that a statement of work "is a description of the work that is to be performed.  It details who, what, when and where but not 'how'."  U.S. Army, LOGCAP 101 Working with LOGCAP in SWA (Draft) 13.  The same document goes on to explain that the military "do[esn't] tell the LOGCAP Contractor[s] how to perform the Mission; [it] just tell[s] them what the end result has to be."  Id. at 14.  The Servicemembers provided declarations that support this account.  Patrick Perkinson, a former Hazardous Materials and Safety Supervisor for KBR, explained in his declaration that "KBR, not the military, was responsible for choosing the location of the burn pits" at Camp Diamondback in Iraq.  In his declaration, KBR's former Corporate Environmental Manager, Lee Lasiter, stated that KBR "was exclusively responsible for operating burn pits in Iraq and Afghanistan [and] for management of wastes generated in the performance of the LOGCAP contract."  Declarants Rick Lambeth, Sylvester L. Aleong, David Jobes, Claude Jordy, and Ronald Smith each made similar statements regarding KBR's operational control over the burn pits at various military bases.

The evidence that KBR submitted also speaks to the military's control over water treatment at bases in Iraq and Afghanistan.  Pursuant to Iraq Task Orders 59, 89, 139, and 159 and Afghanistan Task Orders 116 and 118, KBR "install[ed], operate[d] and maintain[ed] potable and non-potable water

20

systems." Afghanistan Task Orders 13 and 97 direct KBR to "produce, distribute, and store potable/non-potable water," and Afghanistan Task Orders 14 and 98 require KBR to "produce, distribute, and dispose of potable and non-potable water." According to Major Sueann O. Ramsey, who served as the Chief of Preventive Medicine for the Multi-National Corps-Iraq,

> The military had oversight over the provision of water services at base camps within Iraq. Technical medical bulletins provided the basic standards and testing methodologies that governed the provision of potable and non-potable water services. [Multi-National Corps-Iraq] policies provided detailed specifications for military and contractor personnel who were authorized to provide water services in Iraq.

Colonel Steven W. Swann, who served as Commander of the 30th Medical Brigade and Corps Surgeon for the Multi-National Corps-Iraq, similarly explained that, "[i]n Iraq, the Army had oversight regarding the testing, production, and distribution of potable and nonpotable water at base camps. Preventive Medicine detachments regularly tested the water to ensure that the water was safe for soldiers and other personnel at the base camps." Accordingly, this evidence suggests that, although the military delegated many water treatment functions to KBR, the military oversaw water treatment in Iraq and Afghanistan to some degree.

To gauge whether the military's control over KBR rose to the level necessary to implicate the political question doctrine in this case, we—like the Taylor Court—look to the Eleventh

21

Circuit's decision in Carmichael v. Kellogg, Brown & Root Services, Inc. In Carmichael, the Eleventh Circuit considered whether the political question doctrine barred a negligence suit against a government contractor and its employee. 572 F.3d at 1275. The employee was driving a truck in a military convoy transporting fuel in Iraq. Id. at 1278. When the truck rolled over, the plaintiff was seriously injured, leaving him in a permanent vegetative state. Id. The Eleventh Circuit agreed with the district court's conclusion that the plaintiff's suit would "require reexamination of many sensitive judgments and decisions entrusted to the military in a time of war." Id. at 1281. Specifically, pursuant to the Army Field Manual and various task orders, the military decided the date and time of the convoy's departure, the speed of travel, the route, how much fuel to transport, the number of trucks in the convoy, the distance between vehicles, and what security measures were necessary. Id. The court characterized this level of military involvement as "plenary control" warranting application of the political question doctrine. Id. at 1276; see id. at 1281-83.

At this point in the litigation, it does not appear that the military's control over KBR's burn pit and water treatment tasks rose to the level of the military's control over the convoy in Carmichael. In fact, based on the current record, the case at hand more closely resembles the situation in Harris v.

22

Kellogg Brown & Root Services, Inc. In Harris, which we discuss in more detail below, the Third Circuit applied a test very similar to the Taylor test to determine whether the political question doctrine barred a plaintiff's claims against a military contractor. The court explained that "where the military does not exercise control but merely provides the contractor with general guidelines that can be satisfied at the contractor's discretion, contractor actions taken within that discretion do not necessarily implicate unreviewable military decisions." 724 F.3d at 467. The court concluded that the military did not exercise control over the contractor because the military did not provide detailed instructions regarding how to complete work orders or get involved in the contractor's assignments. Id.

Similarly, in this case, the military guidance document that the Servicemembers provided suggests that the military told KBR what goals to achieve but not how to achieve them. The task orders demonstrate that the military delegated trash disposal and water treatment functions to KBR, but they do not establish whether the military directed these tasks. Only one declarant indicated that the military decided where to locate burn pits and determined what substances to dispose of via surface burning. Several other declarations—including some that KBR provided—demonstrate that the military chose which method of waste disposal to use, but they do not indicate whether the

23

military told KBR how to implement that method. Furthermore, although two declarants stated that the military controlled water testing in Iraq, neither declarant spoke regarding water treatment in Afghanistan, which is also at issue in this litigation. In short, although the evidence shows that the military exercised some level of oversight over KBR's burn pit and water treatment activities, we simply need more evidence to determine whether KBR or the military chose how to carry out these tasks. We therefore cannot determine whether the military control factor renders this case nonjusticiable at this time.

## C. "National Defense Interests" Factor

We now turn to the second Taylor factor: "whether national defense interests were closely intertwined with the military's decisions governing KBR's conduct." 658 F.3d at 411. As part of this analysis, we consider whether the Servicemembers' claims or KBR's defenses require us to question the military's judgments. See id. When considering the second Taylor factor, the district court noted that KBR "assert[ed] that [its] conduct was reasonable because the United States Military determined the method of waste disposal, determined burn pit logistics, and determined water control operations." Burn Pit II, 925 F. Supp 2d at 765. The district court also explained that KBR planned to raise a causation defense alleging that the military—not KBR—

24

caused the Servicemembers' injuries.[1]  Id.  According to KBR, this defense would "require the [c]ourt to scrutinize the military's environmental testing efforts and its contemporaneous conclusions that burn pits posed no long-term health problems." Id.  Because these considerations suggested that "[t]he actions complained of [were] not ones taken by [KBR] alone" and "KBR's defense[] . . . would necessarily require review of the reasonableness of military decisions," the district court concluded that the second Taylor factor indicated that this case was nonjusticiable.  Id. at 765-66.  The court therefore held that the political question doctrine prevented it from reaching the merits of the case.  Id.

Regarding the second Taylor factor, the case at hand is somewhat similar to the circumstances at issue in Taylor itself. As it did in Taylor, KBR counters the Servicemembers' claims by arguing that the military's decisions—not KBR's actions—led to the Servicemembers' injuries.  See Taylor, 658 F.3d at 405, 407. As KBR explained in its memorandum in support of its renewed motion to dismiss in this case, "[t]he substantial record before this [c]ourt is replete with evidence, including military

---

[1] The district court also stated that KBR planned to raise a contributory negligence defense.  See Burn Pit II, 925 F. Supp. 2d at 765.  However, as we explain below, it is more appropriate to characterize KBR's argument as a causation defense.

25

declarations and government documents, that supports KBR's liability defense that [the Servicemembers'] alleged injuries were caused by military decisions and conduct, not by KBR." However, unlike the contributory negligence defense at issue in Taylor, analyzing KBR's defense in this case would not "invariably require the Court to decide whether . . . the [military] made a reasonable decision." Id. at 411 (first alteration in original) (emphasis added) (internal quotation marks omitted). Rather than characterizing its argument as a contributory negligence defense, KBR's memorandum in support of its renewed motion to dismiss labels its theory a "proximate causation" defense.[2] This causation defense simply requires the district court to decide if the military made decisions regarding (1) whether to use, how to use, and where to locate burn pits and (2) how to conduct water treatment. KBR's defense therefore does not necessarily require the district court to evaluate the propriety of these judgments.[3]

_____

[2] Even if KBR were to re-plead contributory negligence, thereby possibly requiring the district court to question the military's decision making when it evaluates the Servicemembers' negligence claims, this defense would not affect the Servicemembers' breach of contract claims. The political question doctrine would therefore not render the entire suit nonjusticiable.

[3] In its brief, KBR argues that the Servicemembers indirectly question military judgments by contending that KBR acted negligently because, according to KBR, the military

26

This case more closely resembles the Third Circuit's recent decision in <u>Harris</u>. In that case, the court considered whether the political question doctrine barred a suit against a military contractor accused of negligently performing maintenance duties and causing a soldier's death. 724 F.3d at 463. The contractor raised a causation defense similar to KBR's defense in this case, contending that the military proximately caused the soldier's death through its maintenance actions. <u>Id.</u> at 474. The Third Circuit concluded that the defense required the evaluation of strategic military decisions only if the governing law used a proportional-liability system that assigned liability based on fault. The court therefore held the case was justiciable as long as the plaintiffs did not seek any relief that implicated the proportional-liability system. <u>Id.</u> at 475. For example, under a pure joint-and-several liability system, the plaintiffs could obtain all of their relief from the

---

actually made the decisions at issue in this case. However, at this point in the litigation, it is unclear whether KBR or the military made the allegedly negligent decisions. Furthermore, as we explain below, because KBR raises a causation defense rather than a contributory negligence defense, the military's negligence becomes an issue only under a proportional-liability system that assigns liability based on fault.

military contractor, preventing the need to evaluate the military's decisions.[4] Id. at 474.

We find the Harris court's reasoning persuasive and applicable here. KBR's causation defense does not require evaluation of the military's decision making unless (1) the military caused the Servicemembers' injuries, at least in part, and (2) the Servicemembers invoke a proportional-liability system that allocates liability based on fault. The second Taylor factor therefore does not necessarily counsel in favor of nonjusticiability in this case. Because neither the first nor the second Taylor factor currently indicates that the Servicemembers' claims are nonjusticiable, we hold that the political question doctrine does not render this case nonjusticiable at this time and vacate the district court's decision to dismiss the Servicemembers' claims on that basis.

IV.

We turn next to the Servicemembers' contention that the district court erred in finding that KBR was entitled to

---

[4] This case involves complaints filed in forty-two different states, so it is unclear which state's (or states') law will ultimately apply. Many states have limited joint-and-several liability in tort actions. See Nancy C. Marcus, Phantom Parties and Other Practical Problems with the Attempted Abolition of Joint and Several Liability, 60 Ark. L. Rev. 437, 440 & n.14 (2007).

28

immunity under the FTCA's discretionary function exception.[5]  As a general matter, the United States is immune from suit unless it waives that immunity.  See United States v. Mitchell, 445 U.S. 535, 538 (1980).  The United States waived its immunity from tort suits under certain circumstances in the FTCA, see 28 U.S.C. § 2674, but that waiver is subject to certain exceptions, see id. § 2680.  One of these exceptions is the "discretionary function" exception, which renders the government immune from "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the

---

[5]  The district court did not explicitly rely on the discretionary function exception in concluding that KBR was immune from suit.  Instead, the district court quoted a lengthy passage from its Burn Pit I decision, in which "[t]his ground for dismissal [derivative sovereign immunity] was described." 925 F. Supp. 2d at 766.  The passage discusses the discretionary function exception. Id. at 766-67.  In its appellate brief, KBR does not rely on only the discretionary function exception to support its immunity argument.  Instead, it contends that "[t]here is no question that the U.S. military would be immune from suits arising from the performance of these services under a variety of exceptions to the FTCA, e.g., the discretionary function, combatant activities, and foreign country exceptions." Although we focus on the discretionary function exception below, the conclusion we reach regarding Yearsley v. W.A. Ross Construction Co., 309 U.S. 18 (1940), applies regardless of which FTCA provision underpins KBR's immunity argument. Specifically, as we discuss in detail below, Yearsley allows government contractors to enjoy immunity from suit only if they adhere to the terms of their contracts with the government, and the record is not developed enough at this stage in the litigation to allow us—or the district court—to determine whether KBR satisfied this requirement.

Government, whether or not the discretion involved be abused."
Id. § 2680(a).  A discretionary function is one that "involves an element of judgment or choice."  Berkovitz ex rel. Berkovitz v. United States, 486 U.S. 531, 536 (1988).

The FTCA explicitly excludes independent contractors from its scope.  See 28 U.S.C. § 2671.  Specifically, the statute does not include government contractors in its definition of "federal agency" or "employee of the government."  Id.  ("[T]he term 'Federal agency' . . . does not include any contractor with the United States. . . . 'Employee of the government' includes (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard . . . , and persons acting on behalf of a federal agency in an official capacity . . . and (2) any officer or employee of a Federal public defender organization . . . .").  The discretionary function exception includes both of these terms.

Despite this language, KBR contends that it is entitled to derivative sovereign immunity, which "protects agents of the sovereign from liability for carrying out the sovereign's will."[6]

---

[6]  KBR argues that the FTCA's discretionary function exception entitles it to immunity, not that the provision preempts the state tort laws underlying the Servicemembers' claims.  In Boyle v. United Technologies Corp., 487 U.S. 500 (1988), which we discuss in more detail in Part V of this

Al-Quraishi v. Nakhla, 728 F. Supp. 2d 702, 736 (D. Md. 2010), rev'd on other grounds, Al-Quraishi v. L-3 Servs., Inc., 657 F.3d 201 (4th Cir. 2011), appeal dismissed, Al Shimari, 679 F.3d 205. The concept of derivative sovereign immunity stems from the Supreme Court's decision in Yearsley v. W.A. Ross Construction Co., 309 U.S. 18 (1940). In that case, the Supreme Court considered whether a private contractor could be held liable for damage resulting from a construction project that Congress authorized. Id. at 19-20. When the project caused erosion that damaged nearby property, the injured landowners sued the contractors, claiming that they had effected a taking of their property without just compensation. Id. The Supreme Court explained that

opinion, the Supreme Court considered whether a military contractor was liable under state tort law for an injury that resulted from a design defect. Id. at 502-03. The Court held that the case involved "uniquely federal interests." Id. at 505-06. The Court then explained that the FTCA's discretionary function exception "demonstrate[d] the potential for, and suggest[ed] the outlines of, 'significant conflict' between the federal interests and state law." Id. at 511. In light of these determinations, the Court crafted a test to ensure the preemption of state laws that clashed with the federal interest at play. See id. at 512. Although Boyle, like the case at hand, drew on the discretionary function exception, the Supreme Court specified that Boyle does not govern the question of whether immunity extends to "nongovernment employees." See id. at 505 n.1 (internal quotation marks omitted). KBR asks for derivative sovereign immunity rather than preemption under the discretionary function exception in this case, thus rendering Boyle inapposite.

it is clear that if this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will. Where an agent or officer of the Government purporting to act on its behalf has been held to be liable for his conduct causing injury to another, the ground of liability has been found to be either that he exceeded his authority or that it was not validly conferred.

Id. at 20-21 (citations omitted). In other words, under Yearsley, a government contractor is not subject to suit if (1) the government authorized the contractor's actions and (2) the government "validly conferred" that authorization, meaning it acted within its constitutional power. Id. Applying this test, the Supreme Court determined that the contractors were not liable for damaging the plaintiffs' land because they acted pursuant to Congress's valid authorization. Id. at 21-22.

Yearsley does not explicitly mention sovereign immunity. In fact, the Court based its holding on the fact that the government had "impliedly promised to pay [just] compensation [for any taking] and ha[d] afforded a remedy for its recovery." Id. at 21. Yearsley's ultimate holding is therefore quite narrow:

So, in the case of a taking by the Government of private property for public use such as petitioners allege here, it cannot be doubted that the remedy to obtain compensation from the Government is as comprehensive as the requirement of the Constitution, and hence it excludes liability of the Government's representatives lawfully acting on its behalf in relation to the taking.

32

Id. at 22. Despite this narrow holding, this Court has recognized, based on Yearsley, "that contractors and common law agents acting within the scope of their employment for the United States have derivative sovereign immunity." Butters v. Vance Int'l, Inc., 225 F.3d 462, 466 (4th Cir. 2000). Our sister circuits have reached similar conclusions. See Ackerson v. Bean Dredging LLC, 589 F.3d 196, 206-07 (5th Cir. 2009) (determining that the district court correctly dismissed claims against a contractor when the plaintiff did not allege that the contractor exceeded its authority or that Congress did not validly confer such authority); McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1343 (11th Cir. 2007) (acknowledging the existence of derivative sovereign immunity and its origin in Yearsley); Myers v. United States, 323 F.2d 580, 583 (9th Cir. 1963) (applying Yearsley and concluding that contractor was not liable for work it performed pursuant to a federal contract).

After a well-reasoned discussion in Burn Pit I, the district court concluded that KBR was not entitled to derivative sovereign immunity under Yearsley at that time because immunity depended on whether KBR acted within the scope of its authority, which the court could not determine at that point in the litigation. See 736 F. Supp. 2d at 968. The district court reversed course in Burn Pit II, finding that the Supreme Court's

33

2012 decision in Filarsky v. Delia compelled extending derivative sovereign immunity to KBR. See 925 F. Supp. 2d at 767. Specifically, the district court noted that Filarsky cautioned against leaving individuals who work alongside government employees "holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity." Filarsky, 132 S. Ct. at 1666; Burn Pit II, 925 F. Supp. 2d at 767. Therefore, without applying the law to the facts at hand, the district court concluded that KBR was immune from suit because it was a military contractor "performing services for the government in war zones." Burn Pit II, 925 F. Supp. 2d at 767.

In Filarsky, the Supreme Court considered whether an attorney was entitled to qualified immunity in a 42 U.S.C. § 1983 action when he assisted government employees in investigating whether a firefighter was feigning illness to avoid work. 132 S. Ct. at 1660-61. The Court determined that the common law did not distinguish between government employees and private actors serving the government in 1871, when Congress enacted § 1983. See id. at 1661-65. Because Congress had not expressed "clear legislative intent" contrary to the common law treatment, the Court determined that qualified immunity was not linked to whether an individual was a full-time government employee. Id. at 1665 (internal quotation marks omitted).

34

Instead, the relevant inquiry is whether a government employee performing the same action would be entitled to qualified immunity. Id. The Court then turned to the policy justifications underlying qualified immunity to see if they also counseled in favor of applying it to private actors assisting government employees. Those interests are "avoid[ing] 'unwarranted timidity' in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing harmful distractions from carrying out the work of government that can often accompany damages suits." Id. The Court determined that all of these interests supported extending qualified immunity to the attorney. Id. at 1665-66.

Contrary to the district court's conclusion, there is no indication that the Supreme Court intended Filarsky to overrule Yearsley and its progeny. See Filarsky, 132 S. Ct. at 1669 (Sotomayor, J., concurring) ("[I]t does not follow that every private individual who works for the government in some capacity necessarily may claim qualified immunity . . . . Such individuals must satisfy our usual test for conferring immunity."). The Supreme Court framed the question presented in Filarsky as "whether an individual hired by the government to do its work is prohibited from seeking such immunity [under § 1983], solely because he works for the government on something other than a permanent or full-time basis." Id. at 1660. After

35

tracing the history of common law immunity up to the point Congress enacted § 1983, the Court concluded "immunity under § 1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis." Id. at 1662-65 (emphasis added). The opinion never mentions Yearsley, sovereign immunity, or the FTCA and never purports to extend beyond § 1983 qualified immunity. We therefore believe that the district court erred in concluding that Filarsky compelled altering the conclusion that it reached in Burn Pit I.

We interpret Filarsky as reaffirming the principles undergirding the Yearsley rule, albeit in the context of § 1983 qualified immunity rather than derivative sovereign immunity. Like Filarsky, Yearsley recognizes that private employees can perform the same functions as government employees and concludes that they should receive immunity from suit when they perform these functions. Furthermore, Yearsley furthers the same policy goals that the Supreme Court emphasized in Filarsky. By rendering government contractors immune from suit when they act within the scope of their validly conferred authority, the Yearsley rule combats the "unwarranted timidity" that can arise if employees fear that their actions will result in lawsuits. Filarsky, 132 S. Ct. at 1665. Similarly, affording immunity to government contractors "ensur[es] that talented candidates are

36

not deterred from public service" by minimizing the likelihood that their government work will expose their employer to litigation. Id. Finally, by extending sovereign immunity to government contractors, the Yearsley rule "prevent[s] the harmful distractions from carrying out the work of government that can often accompany damages suits." Id.

We now turn to applying the Yearsley rule, which asks us to consider whether the government authorized KBR's actions in this case.[7] As this Court explained in Butters v. Vance International, Inc., that inquiry involves determining whether KBR "exceeded [its] authority under [its] valid contract," which the Court also characterized as exceeding "the scope of [its] employment." 225 F.3d at 466. The parties debate whether we should construe the scope of KBR's authority narrowly or broadly. According to the Servicemembers, KBR exceeded its authority in this case because it violated the specific terms of LOGCAP III and other "government directives." By contrast, KBR takes a broader view, contending that it acted within the scope

---

[7] The parties do not dispute that the military had the power to delegate waste management and water treatment functions to a government contractor. We therefore need not consider the component of the Yearsley analysis that asks whether "the project was validly conferred, that is, if what was done was within the constitutional power of Congress." Yearsley, 309 U.S. at 20-21.

37

of its authority by performing general waste management and water treatment functions.[8]

Yearsley supports the Servicemembers' view. In Yearsley, the Supreme Court emphasized that "[t]he Court of Appeals . . . found it to be undisputed that the work which the contractor had done . . . was all authorized and directed by the Government of the United States." 309 U.S. at 20 (emphasis added) (internal quotation marks omitted). This language suggests that the contractor must adhere to the government's instructions to enjoy derivative sovereign immunity; staying within the thematic umbrella of the work that the government authorized is not

---

[8] KBR suggests that a government contractor is entitled to derivative sovereign immunity if it qualifies as a common law agent of the government. Specifically, KBR cites an unpublished decision from this Court, which explains that, under Virginia law, "[w]hether an agent acted within the scope of his authority turns not on whether the particular act at issue—often a tort committed by the agent—is 'within the scope of the agent's authority, but [on] whether the service itself in which the tortious act was done was . . . within the scope of such authority.'" First Tenn. Bank Nat'l Ass'n v. St. Paul Fire & Marine Ins. Co., 501 F. App'x 255, 260 (4th Cir. 2012) (second and third alterations in original) (quoting Broaddus v. Standard Drug Co., 179 S.E.2d 497, 503 (Va. 1971)). However, common law agent status is not sufficient to establish derivative sovereign immunity. As the Eleventh Circuit reasoned in McMahon v. Presidential Airways, Inc., if all common law agents of the government enjoyed derivative sovereign immunity due to their agency status, the immunity of the government and its officers would be coextensive, which is not necessarily the case. See 502 F.3d at 1343-45 & n.15. Furthermore, as we explain below, Yearsley itself supports our conclusion that simply being the government's common law agent does not entitle a contractor to derivative sovereign immunity.

38

enough to render the contractor's activities "the act[s] of the government." See id. at 22 (internal quotation marks omitted). The Ninth Circuit similarly interpreted Yearsley in Myers v. United States. In that case, the court considered whether landowners could recover from a private company that damaged their property while constructing a road pursuant to a government contract. See 323 F.2d at 580-82. The court held that, "[t]o the extent that the work performed by [the contractor] was done under its contract with the Bureau of Public Lands, and in conformity with the terms of said contract, no liability can be imposed upon it for any damages claimed to have been suffered by the [landowners]." Id. at 583. The court went on to explain that, "[i]f [the landowners] suffered any damage from any act of [the contractor] over and beyond acts required to be performed by it under the contract, or acts not in conformity with the terms of the contract," the contractor was not liable because the landowners consented to its actions. Id. In other words, when the contractor exceeded its authority under the contract, Yearsley did not provide the basis for escaping liability; the landowners' acquiescence did. Accordingly, as Yearsley and Myers show, KBR is entitled to derivative sovereign immunity only if it adhered to the terms of its contract with the government.

At this point in the litigation, the record does not contain enough evidence to determine whether KBR acted in conformity with LOGCAP III, its appended task orders, and any laws and regulations that the contract incorporates. We also lack evidence regarding whether the military permitted or required KBR to deviate from the contract's terms under certain circumstances. Accordingly, we hold that the district court erred in finding that KBR was entitled to derivative sovereign immunity at this time and vacate the court's decision to dismiss the Servicemembers' claims on that ground.

We also note that the district court did not address whether KBR's waste management and water treatment activities constituted "discretionary functions" under the FTCA. However, as we explain above, a discretionary function "involves an element of judgment or choice." Berkovitz, 486 U.S. at 536. If the military dictated exactly how KBR should undertake its waste management and water treatment tasks, those functions were not discretionary because they did not involve an element of judgment or choice. By contrast, if KBR enjoyed some discretion in how to perform its contractually authorized responsibilities, the discretionary function exception would apply, and KBR could be liable. The district court should conduct this inquiry before determining whether KBR is entitled to derivative sovereign immunity under the discretionary function exception.

40

Finally, the Servicemembers contend that the district court erred in finding that the FTCA's combatant activities exception preempted the state tort[9] laws undergirding their claims. Pursuant to the combatant activities exception, the United States is immune from "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). The statute does not define the terms "arising out of" and "combatant activities."

Relying on the Supreme Court's decision in Boyle v. United Technologies Corp., multiple circuit courts have held that the federal interests inherent in the combatant activities exception conflict with, and consequently can preempt, tort suits against government contractors when those suits arise out of what those courts viewed as combatant activities. See Harris, 724 F.3d

---

[9] We note that the Servicemembers bring breach of contract claims in addition to their tort claims. In general, "[t]he FTCA does not apply to common law contract claims." Tritz v. U.S. Postal Serv., 721 F.3d 1133, 1141 (9th Cir. 2013). However, it may apply when a plaintiff brings a contract claim seeking a tort remedy rather than a contract remedy such as rescission. See id. Because the district court did not discuss how the FTCA affects the Servicemembers' breach of contract claims, we decline to address this issue to allow the district court to do so in the first instance on remand. See Q Int'l Courier, Inc. v. Smoak, 441 F.3d 214, 220 n.3 (4th Cir. 2006) ("Although we are not precluded from addressing [questions the district court did not reach], we deem it more appropriate to allow the district court to consider them, if necessary, in the first instance on remand.").

458; Saleh, 580 F.3d 1; Koohi v. United States, 976 F.2d 1328, 1336 (9th Cir. 1992). The district court initially found that the combatant activities exception did not preempt state law because the record was not developed enough to assess whether preemption was appropriate. See Burn Pit I, 736 F. Supp. 2d at 976-78. However, the district court once again reversed course in Burn Pit II, holding that preemption was appropriate under a test that the United States recommended in amicus briefs that it filed in this Court's rehearing en banc of Al Shimari and in support of denying the petition for writ of certiorari in Saleh. See Burn Pit II, 925 F. Supp. 2d at 769-72.

Before we can reach the question of whether the combatant activities exception preempts state tort law due to the United States' proposed test, we must first decide whether to apply the United States' test at all—an analytical step that the district court skipped. The Supreme Court's Boyle decision governs this inquiry. Boyle arose when a Marine helicopter co-pilot died after his helicopter crashed into the ocean during a training exercise. 487 U.S. at 502. Although the co-pilot survived the crash, he could not open the helicopter's escape hatch, causing him to drown. Id. The co-pilot's father sought to hold the military contractor that built the helicopter liable under state tort law, contending that it defectively repaired part of the

42

helicopter's flight control system and defectively designed the escape hatch. Id. at 502-03. The Court explained,

> In most fields of activity, to be sure, this Court has refused to find federal pre-emption of state law in the absence of either a clear statutory prescription or a direct conflict between federal and state law. But we have held that a few areas, involving "uniquely federal interests," are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts-so-called "federal common law."

Id. at 504 (citations omitted).[10] The Court then analyzed whether the situation at hand in that case invoked "uniquely federal interests" in a way that warranted preemption.

The Boyle Court employed a three-step process to determine whether federal law preempted state law. First, it identified the "uniquely federal interests" at issue in that case. See id. at 504-07. Second, it determined whether there was a "significant conflict" between those interests and state law. Id. at 507-12. The Court identified the FTCA's discretionary function exception as "a statutory provision that demonstrates the potential for, and suggests the outlines of, 'significant conflict' between federal interests and state law." Id. at 511. The Court then explained that "'second-guessing' [the

---

[10] This excerpt from Boyle makes clear that Congress need not act affirmatively to cause the preemption of state law. The Servicemembers' arguments to this effect therefore lack merit.

43

government's selection of a helicopter design] through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption" because government contractors would raise their prices to compensate for possible lawsuits, rendering the government financially liable.  Id. at 511-12 (citation omitted).   Third, the Court formulated a test that ensured preemption of state laws that clashed with the federal interests at play. See id. at 512-13.

A.

We now turn to the first step of the Boyle analysis.  The D.C. Circuit, Ninth Circuit, and Third Circuit have each articulated a different "uniquely federal interest" underlying cases in which a litigant attempts to hold a government actor responsible for its combatant activities—in other words, the federal interest buttressing the combatant activities exception. In Saleh, the D.C. Circuit began its inquiry by noting that, although "[t]he legislative history of the combatant activities exception is 'singularly barren,' . . . it is plain enough that Congress sought to exempt combatant activities because such activities 'by their very nature should be free from the hindrance of a possible damage suit.'"  580 F.3d at 7 (quoting Johnson v. United States, 170 F.2d 767, 769 (9th Cir. 1948)). The court went on to explain that the "traditional rationales

44

for tort law—deterrence of risk-taking behavior, compensation of victims, and punishment of tortfeasors—are singularly out of place in combat situations, where risk-taking is the rule." Id. In light of these considerations, the D.C. Circuit determined that "the policy embodied by the combatant activities exception is simply the elimination of tort from the battlefield, both to preempt state or foreign regulation of federal wartime conduct and to free military commanders from the doubts and uncertainty inherent in potential subjection to civil suit." Id. Based on similar considerations, the Ninth Circuit articulated the interest underlying the combatant activities exception as "recogniz[ing] that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action." Koohi, 976 F.2d at 1337.

The Third Circuit rejected both of these approaches in Harris. The court noted that the FTCA limits the combatant activities exception to "claim[s] arising out of . . . combatant activities," 28 U.S.C. § 2680(j) (emphasis added), and pointed out that, in other areas of the law, "arising out of" "denote[s] any causal connection." 724 F.3d at 479 (quoting Saleh, 580 F.3d at 6) (internal quotation marks omitted). In light of this "arising out of" language, the court concluded that the Ninth Circuit's formulation of the interest was too narrow because it

45

rested on the premise that "no duty of reasonable care is owed to those against whom force is directed," Koohi, 976 F.2d at 1337 (emphasis added), which omits individuals who suffer harms that flow tangentially from wartime force. See Harris, 724 F.3d at 480. The court cited Saleh favorably, see id., but ultimately determined that the D.C. Circuit's formulation of the interest underlying the combatant activities exception was too broad, id. at 480-81. Specifically, the court explained that the FTCA "does not provide immunity to nongovernmental actors. So to say that Congress intended to eliminate all tort law is too much." Id. at 480. The Third Circuit therefore announced a test that falls between these two extremes: "The purpose underlying § 2680(j) . . . is to foreclose state regulation of the military's battlefield conduct and decisions." Id.

We find the Third Circuit's analysis persuasive and adopt its formulation of the interest at play here. In Boyle, the Supreme Court reasoned that no "uniquely federal interest" warrants preemption when the federal government has little or no control over a contractor's conduct. See 487 U.S. at 509-10 (explaining that the government would have no interest in the design of a helicopter door if it ordered stock helicopters that just happened to have a certain door design). Due to Boyle and the FTCA's omission of government contractors, we agree that the D.C. Circuit's test is too broad because it does not limit the

46

interest of "eliminat[ing] . . . tort from the battlefield" to actors under military control.  See Saleh, 580 F.3d at 7.  We also agree with the Third Circuit's conclusion that the Ninth Circuit's test is too narrow because of the combatant activities exception's broad "arising out of" language.  If the interest at play were "recogniz[ing] that during wartime encounters no duty of reasonable care is owed to those against whom force is directed," Koohi, 976 F.2d at 1337, the combatant activities exception presumably would contain language limiting its scope to claims stemming directly from the use of force.

B.

Now that we have identified the federal interest at play in this case, we move on to the second step of the Boyle analysis: determining whether there is a significant conflict between this federal interest and the operation of the state tort laws underlying the Servicemembers' claims.  In Boyle, this conflict was discrete because it was impossible to construct the helicopter according to the government's design and satisfy the state-imposed duty of care.  487 U.S. at 509.  However, in the combatant activities exception realm, the conflict between

47

federal and state interests is much broader.[11]   As the D.C.
Circuit explained in Saleh, "the relevant question is not so
much whether the substance of the federal duty is inconsistent
with a hypothetical duty imposed by the state."   580 F.3d at 7.
Instead, when state tort law touches the military's battlefield
conduct and decisions, it inevitably conflicts with the
combatant activity exception's goal of eliminating such
regulation of the military during wartime.   In other words, "the
federal government occupies the field when it comes to warfare,
and its interest in combat is always 'precisely contrary' to the
imposition of a non-federal tort duty."   Id. (quoting Boyle, 487
U.S. at 500).

---

[11] Although the conflict between federal interests and state
tort law is broad in the combatant activities exception context,
we can also identify several specific conflicts.   Notably, as
the Supreme Court recognized in Boyle, imposing tort liability
on contractors that carry out the government's orders will
result in the contractor charging higher prices, a cost that the
taxpayers will ultimately bear.    487 U.S. at 511-12.
Furthermore, haling a government contractor into a court
proceeding that questions the military's decision making will
distract government personnel from their tasks and allow
"judicial probing of the government's wartime policies." Saleh,
580 F.3d at 8.    Finally, "given the numerous criminal and
contractual enforcement options available to the government in
responding to alleged contractor misconduct[,] . . . allowance
of these claims will potentially interfere with the federal
government's authority to punish and deter misconduct by its own
contractors." Id.

Finally, we turn to Boyle's third step:  formulating a test that ensures preemption when state tort laws conflict with the interest underlying the combatant activities exception.  See Boyle, 487 U.S. at 512-13.  KBR argues in favor of both the test the D.C. Circuit announced in Saleh and the test the United States advocated in amicus briefs that it filed in connection with Al Shimari. and the petition for writ of certiorari in Saleh.  In Saleh, the D.C. Circuit articulated the following test:  "During wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted." 580 F.3d at 9.  The court reasoned that the military need not maintain "exclusive operational control" over the contractor for the government to have an interest in immunizing a military operation from suit.  Id. at 8-9.  It therefore crafted a test that allowed the contractor to exert "some limited influence over an operation," as long as the military "retain[ed] command authority."  Id.

Alternatively, the United States recommends preemption when (1) "a similar claim against the United States would be within the combatant activities exception of the FTCA" and (2) "the contractor was acting within the scope of its contractual

49

relationship with the federal government at the time of the incident out of which the claim arose." Brief of United States as Amicus Curiae at 17-18, Al Shimari v. CACI Int'l, Inc., 679 F.3d 205 (4th Cir. 2012) (Nos. 09-1335, 10-1891, 10-1921). In the amicus brief that it filed in Saleh, the United States identified three key flaws in the Saleh test. First, it explained that, "[u]nder domestic and international law, civilian contractors engaged in authorized activity are not 'combatants'; they are 'civilians accompanying the force' and, as such, cannot lawfully engage in 'combat functions' or 'combat operations.'" Brief for United States as Amicus Curiae at 15, Saleh v. Titan Corp., 131 S. Ct. 3055 (2011) (No. 09-1313). Therefore, the United States argued that it was inappropriate for the Saleh test to focus on whether the contractor was engaged in combatant activities. Id. Second, the United States contended that the Saleh test does not account for the fact that the combatant activities exception provides immunity for activities "arising out of" the military's combatant activities. It claimed that "[a] more precise focus on claims 'arising out of' the military's combatant activities would allow for a more accurate assessment of the contractor's distinct role, and avoid confusing it with the role of military personnel." Id. at 16. Third, the United States explained that the Saleh court "did not address whether application of the preemption defense it

50

recognized would be appropriate if contractor employees acted outside the scope of their employment or the contractor acted outside the scope of the contract." Id. The United States reiterated these arguments in the brief it filed in Al Shimari and formulated the above test to address these defects. See Brief of United States as Amicus Curiae at 16-20, Al Shimari, 679 F.3d 205 (Nos. 09-1335, 10-1891, 10-1921).

In Burn Pit II, the district court favorably cited these amicus briefs and adopted the United States' test. 925 F. Supp. 2d at 769-71. However, the United States' criticisms of the Saleh test are flawed in several respects. First, even if government contractors cannot qualify as "combatants" under domestic and international law, this fact is irrelevant because the Saleh test does not require private actors to be combatants; it simply requires them to be "integrated into combatant activities." Saleh, 580 F.3d at 9; cf. Johnson, 170 F.2d at 770 (explaining that "combatant activities" suggests a "wider scope" than "combatant"). Second, the United States inaccurately contends that the Saleh test does not reflect the combatant activities exception's use of the phrase "arising out of." In fact, the Saleh test does mirror this phrase, specifying that "a tort claim arising out of the contractor's engagement in [combatant activities over which the military retains command authority] shall be preempted." 580 F.3d at 9. Third, the

51

United States complains that the Saleh test does not address how to treat contractors who act outside the scope of their employment or violate the terms of their contract. However, the purpose of the combatant activities exception is not protecting contractors who adhere to the terms of their contracts; the exception aims to "foreclose state regulation of the military's battlefield conduct and decisions." Harris, 724 F.3d at 480. By focusing on whether the contractor was "integrated into combatant activities over which the military retain[ed] command authority," Saleh, 580 F.3d at 9, the Saleh test ensures that the FTCA will preempt only state tort laws that touch the military's wartime decision making. We therefore reject the rationales underlying the United States' test—the same rationales that buttressed the district court's Burn Pit II decision.

We agree with the Third Circuit's determination that, if the interest underpinning the combatant activities exception is foreclosing state regulation of the military's battlefield conduct and decisions, the United States' test is far too broad. See Harris, 724 F.3d at 480-81. The test recommends preemption when state tort laws touch any actions within the scope of the contractor's contractual relationship with the government, even actions that the military did not authorize. In this way, the United States' test preempts state tort laws even when they do

52

not conflict with the federal purpose underlying the combatant activities exception. To the contrary, the Saleh test allows the preemption of state tort law only when it affects activities stemming from military commands. See id. (reaching the same conclusions). Due to the closer fit between the Saleh test and the interest at play in this case, we adopt the Saleh test here.

The Saleh test requires a contractor to be "integrated into combatant activities" for preemption to occur. We therefore must determine whether waste management and water treatment constitute "combatant activities" when these tasks occur in warzones. In Johnson v. United States, the Ninth Circuit held that combatant activities "include not only physical violence, but activities both necessary to and in direct connection with actual hostilities," such as "supplying ammunition to fighting vessels in a combat area during war." 170 F.2d at 770. The Third Circuit and at least one district court have adopted the Johnson test. See Harris, 724 F.3d at 481 (maintaining electrical systems on a military base in a warzone qualified as combatant activity); Aiello v. Kellogg, Brown & Root Servs., Inc., 751 F. Supp. 2d 698, 711-12 (S.D.N.Y. 2011) (holding that latrine maintenance constituted combatant activity because the contractor "was providing basic life support services for active military combatants on a forward operating base").

53

We agree with the Johnson court's reasoning and adopt its test here. As the Ninth Circuit explained, "'[c]ombat' connotes physical violence; 'combatant,' its derivative, as used here, connotes pertaining to actual hostilities; the phrase 'combatant activities,' [is] of somewhat wider scope." Johnson, 170 F.2d at 770 (footnote omitted). It therefore makes sense for combatant activities to extend beyond engagement in physical force. Furthermore, viewing "combatant activities" through a broader lens furthers the purpose of the combatant activities exception. If a government contractor remained subject to state tort suits stemming from activities other than physical force, the Saleh test would not successfully "foreclose state regulation of the military's battlefield conduct and decisions," Harris, 724 F.3d at 480, which could encompass conduct and decisions that do not involve actual combat. Performing waste management and water treatment functions to aid military personnel in a combat area is undoubtedly "necessary to and in direct connection with actual hostilities." Johnson, 170 F.2d at 770. We therefore hold that KBR engaged in combatant activities under the Johnson test.

Next, the Saleh test asks whether "the military retain[ed] command authority" over KBR's waste management and water treatment activities. 580 F.3d at 9. At this stage in the litigation, although it is evident that the military controlled

54

KBR to some degree, see supra Part III.B, the extent to which KBR was integrated into the military chain of command is unclear. See Saleh, 580 F.3d at 4 (identifying the proper focus as "the chain of command and the degree of integration that, in fact, existed between the military and [the] contractors' employees rather than the contract terms"). The district court therefore erred in resolving this issue before discovery took place. Accordingly, we vacate its decision to dismiss the Servicemembers' claims on the basis of preemption.

## VI.

For the foregoing reasons, we vacate the district court's decision to dismiss the Servicemembers' claims and remand for further proceedings consistent with this opinion.

<u>VACATED AND REMANDED</u>