FLOYD, Circuit Judge:
*253 The Constitution entrusts the President and Congress, not the courts, with the power to resolve political questions. See Japan Whaling Ass'n v. Am. Cetacean Soc'y , 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) ; Taylor v. Kellogg, Brown & Root Servs., Inc. , 658 F.3d 402, 408-409 (4th Cir. 2011). The issue before us is whether a suit brought by United States military personnel, civilian contractors, and surviving family members (collectively "Servicemembers") against Kellogg, Brown, & Root, LLC, and Halliburton Company (collectively "KBR") for injuries allegedly caused by KBR's waste management and water services across Iraq and Afghanistan implicates such a political question.
This case returns to us after the district court created an extensive factual record through a herculean discovery process and once again concluded that the Servicemembers' suit implicates a political question that federal courts cannot adjudicate. See In re KBR, Inc., Burn Pit Litig. , 268 F.Supp.3d 778 (D. Md. 2017) (" Burn Pit IV "). Additionally, the district court held that the Federal Tort Claims Act ("FTCA") preempts the Servicemembers' claims. We agree with the district court that the political question doctrine bars the Servicemembers' suit. Therefore, we need not reach the FTCA preemption issue. Accordingly, we affirm in part and vacate in part.
I.
A.
Since the United States began its military operations in Afghanistan and Iraq in 2001 and 2003, respectively, the U.S. military has depended heavily on contractors to support its mission. For example, as the military established forward operating bases ("FOBs") across the two theaters, those bases necessitated extensive contractor support for the management of waste, ammunition, fuel, and facilities, and provision of water treatment and food services, so that the warfighters could focus on combat operations. To provide waste management and water services at the FOBs, the Army awarded KBR a ten-year contract called the Logistics Civil Augmentation Program III ("LOGCAP III").
Since 2008, through 63 separate complaints, the Servicemembers have sued KBR, alleging that they suffered harms from being exposed to smoke from open air burn pits and drinking impure water.[1] The Judicial Panel on Multidistrict Litigation consolidated and transferred these cases to the District of Maryland for pretrial proceedings. The amended complaint, in large part, alleges that KBR failed to design, manage, and operate the burn pits safely and to treat and monitor water qualities.
Before any jurisdictional discovery took place, on February 27, 2013, the district court granted KBR's renewed motion to *254 dismiss.[2] In re KBR, Inc., Burn Pit Litig. , 925 F.Supp.2d 752, 774 (D. Md. 2013) (" Burn Pit II "). The district court concluded that (1) the case presented a nonjusticiable political question, (2) KBR was shielded from suit under derivative sovereign immunity, and (3) the FTCA preempted the Servicemembers' state law claims. See id. at 765-68, 771. On appeal, this Court vacated and remanded on the grounds that the record was not sufficiently developed to support the district court's decision. In re KBR., Burn Pit Litig. , 744 F.3d 326 (4th Cir. 2014) (" Burn Pit III ").
On remand, the district court commenced jurisdictional discovery regarding "(1) [t]he degree to which the military controlled KBR's performance of the contracts" and "(2) [t]he degree to which KBR was integrated into military command."[3] J.A. 332. Jurisdictional discovery yielded over 5.8 million pages of documents, including almost a million pages of contract documents, and 34 witness depositions. After the conclusion of jurisdictional discovery, KBR moved to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) based on the political question doctrine and for summary judgment pursuant to Rule 56 based on FTCA preemption. The district court held an evidentiary hearing during which each side presented a comprehensive case. KBR presented six live witnesses. The Servicemembers presented one live witness and introduced deposition testimony excerpts and the contractual language from LOGCAP III and various task orders.
B.
Based on the evidence gathered from jurisdictional discovery and presented during the evidentiary hearing, the district court made key factual findings pertaining to (1) KBR's management of waste, (2) KBR's provision of water services, (3) the military's contracting process, and (4) KBR's integration into the military chain of command.
1.
The district court found that "the military, after balancing all the risks and alternative methods of waste disposal, made the sensitive decision to use burn pits, and only burn pits, at all FOBs in Iraq and Afghanistan." Burn Pit IV , 268 F.Supp.3d at 803. The district court also found that the military determined that no feasible alternatives to burn pits-such as the use of incinerators, landfills, or recycling-were available, and KBR could not unilaterally decide to use burn pits. Id. at 806-07.
In making these findings, the district court relied on the testimony of Lieutenant General, retired, Ricardo Sanchez, the commanding general of the U.S. forces in Iraq in the immediate aftermath of the invasion of Iraq, who testified that the military's theater command "mandated that burn pits be used for eliminating all of the trash" across the entire theater. Id. at 791 (quoting J.A. 4852). The court also cited the testimony of Lieutenant General, retired, John Vines, who assumed command after General Sanchez, that his predecessor's "standing orders remain[ed] in effect," that he did not need to affirmatively re-authorize the use of the burn pits, and that he did not consider alternatives to *255 burn pits to be feasible. Id. at 792 (quoting J.A. 4917).
The district court explained that the theater command's decision to use burn pits "reflected a military judgment ... in the dangerous, wartime contingency environment." See id. at 807. The district court relied on General Vines's testimony that alternatives such as landfills or recycling services were not feasible because "the slightest movement [of the U.S. forces] expose[d] those moving to hostile actions." Id. at 806 (quoting J.A. 4918). The record also contains a written declaration of General Sanchez who similarly opined that landfills inside the FOBs would have posed a risk of the spread of disease, stench, and vermin, and landfills outside the FOBs would have posed "an unacceptable level of security risk" to personnel disposing of waste. J.A. 914.
The district court further found that the military decided against using incinerators and that KBR could not unilaterally decide to install incinerators to dispose of waste. The court relied on various witness testimonies, establishing that the military had to approve the acquisition, funding, and transportation of incinerators into the Iraqi theater. The district court also cited to General Vines's testimony that "everything that came in[to] [Iraq] required support sustainment" and "had side effects." Burn Pit IV , 268 F.Supp.3d at 807 (quoting J.A. 4918). Bringing the incinerators into Iraq would have required the military to provide a military convoy, potentially diverting combat personnel. Based on this testimony, the district court found that the military-not KBR-decided to forgo the use of incinerators. In addition to the district court's findings, the record contains General Sanchez's written declaration that the acquisition and transportation of the incinerators did not amount to a military priority because, given the "limited transportation capacity," the military focused on transporting "mission-critical supplies, i.e., ammunition and fuel." J.A. 916.
The district court further found that the military "made all decisions regarding the location of burn pits on the FOBs in Iraq and Afghanistan." Burn Pit IV , 268 F.Supp.3d at 804. The district court cited to various witnesses' testimonies stating that every FOB had a base commander who "exert[ed] total operational and physical control" over the base, that these base commanders "decided where everything went," including the burn pits, and that KBR could not "unilaterally move a burn pit from one location to another." Id. at 805 (quoting J.A. 1076, 1362, 4955). The record also contains General Vines's testimony, explaining that the location for a burn pit implicated a military decision that only the military commanders could make, because the burn pit "could affect the road network, communications plan, building [of] a quick reaction force, [the ability to] maneuver[ ] around the base in event of infiltration, [the] potential for introduction of disease, [t]he effect of wind direction, the effect of smoke, [and the] operation on an air field." J.A. 4923.
In addition to the siting decisions, the district court found that "[t]he military exercised control over the operation of the burn pits," and that "KBR was at all times acting under the comprehensive direction and control of the military." Burn Pit IV , 268 F.Supp.3d at 805-06. One example of the military's exercise of control, the court noted, was the military's determination as to which items could be burned and which items could not. Based on the two commanding generals' testimonies, various memoranda, and letters of technical direction ("LOTD"),[4] the court observed that *256 the military directed the following items to be burned: plastic water bottles, animal carcasses, dining facility trash, woven fiber filters, and oil filters. Id. at 805. Additionally, the district court cited the declaration of Gerald E. Vincent, a Department of the Army civilian employee who served as the Environmental Program Manager in Iraq, stating that "[i]f something was not specifically prohibited, then it was allowed to be burned." Id. at 806 (quoting J.A. 1797). Relatedly, as the district court noted, the military determined that hazardous materials were "to be segregated and disposed of by a method other than surface burning" and "not authorized to be placed in burn pits." Id. (quoting J.A. 4933).
Other portions of the record, cited by the district court, similarly demonstrate the military's plenary control over the operation of the burn pits. For example, one LOTD, dated January 1, 2006, directs KBR "to reduce the amount of solid waste being burned at Camp Echo at one time by conducting multiple burns of smaller quantities of trash." J.A. 2039. With regard to the hours of operation, the district court cited to one LOTD, dated November 11, 2006, that directed KBR to change the burn pit hours at FOB Summerall, Iraq, from 24 hours to 10 hours a day; and then to another LOTD, dated December 29, 2006, that directed KBR to operate the burn pit at Bagram Air Field, Afghanistan, for 24 hours. Burn Pit IV , 268 F.Supp.3d at 805 (quoting J.A. 2050, 2052). Lastly, the standard operating procedure in place for the U.S. forces in Iraq provided that "[f]lames above the burning material must not be higher than (2) Feet." J.A. 4394.
2.
Next, the district court found that "the military retained a high level of control over KBR's provision of water services in Iraq and Afghanistan" and that the military's control was "not limited to the 'what' of providing water, but rather included highly detailed specifications concerning 'how' it was to be provided." Burn Pit IV , 268 F.Supp.3d at 808. The record demonstrates that water services amounted to a critical element of "force health protection" because it concerned prevention of dehydration, disease, and other non-battle injuries which could seriously undermine the readiness of the U.S. forces. See J.A. 1596, 1613. Yet, General Sanchez testified that water services presented a unique challenge to the military in theater as it "could not tap into Iraqi sources of water." J.A. 4839. The only options were to rely on reverse osmosis water purification or bottled water. The record indicates that bottled water was disfavored because transporting water was not as critical as transporting ammunition and fuel. Thus, the military units and civilian contractors produced potable water through reverse osmosis purification, "filtering and treating a variety of raw water sources, e.g., rivers and wells." J.A. 1818.
The district court found that the military "retained ultimate control over KBR's performance of [water] services and tested the water to ensure that the detailed military standards and methods were being met." Burn Pit IV , 268 F.Supp.3d at 809. In making this finding, the district court relied on the written declaration of Lieutenant Colonel Tara Hall, the former Chairperson of the Multi-National Corps-Iraq Water Quality Board, who stated that the "Army Preventive Medicine had oversight over water operations in Iraq and supervised the production, testing, and distribution *257 of potable and nonpotable water." Id. at 801 (quoting J.A. 1818). In that declaration, Hall further explained that "the Army routinely tested potable and nonpotable water to ensure the water was safe for human uses" and "routinely certified and inspected [reverse osmosis water purification units] to ensure safety and sanitation." J.A. 1818. Although the district court acknowledged that "KBR was, at times, responsible for testing and ensuring the quality of water that it delivered," the court nevertheless found that "the military retained ultimate control." Burn Pit IV , 268 F.Supp.3d at 808. The district court relied on testimonial and record evidence indicating that "Preventive Medicine personnel in theater were required, and regularly conducted, surveillance of the potable water at base camps." Id. (quoting J.A. 2192).
After finding that the military retained control over water quality, the district court cited various documents to further find that the military directed KBR on how to produce water, detailing the quantity, frequency, and location of production. Id. at 808. The record contains various documents, such as Task Order 89 which listed the varied amounts of water to be produced and stored at eight FOBs, directed KBR to "distribute potable water daily (seven days per week) to units within 250 km from [the specified locations]," and authorizing the use of reverse osmosis purification. J.A. 4100. Additionally, the record includes various LOTDs directing KBR to, for example, provide 52,000 gallons of water, fill water tanks, test water to a new dining facility, and operate certain water wells for up to 8 hours a day.
3.
With regard to the military's contracting process, the district court found that "[t]he operational arm of the military dictated all requirements" and that the military's contracting arm "implemented these decisions through the contracting process." Burn Pit IV , 268 F.Supp.3d at 807. Under the relevant federal acquisitions practices, only contracting professionals-such as contracting officers or administrative contracting officers-can alter the terms of a government contract or issue contract guidance through written documents such as LOTDs or administrative change letters. The military's uniformed contracting professionals do not fall under the operational chain of command; instead, they often fall under a separate chain of command under the Defense Contract Management Agency ("DCMA"). DCMA receives delegated contract administration authority from a contracting agency, such as the Army Materials Command, and ensures that "both the contractor and the Government comply with the terms and conditions of the contract." J.A. 1066. In war zones, although there existed a formal divide between the operational arm and the contracting arm of the military, the contracting arm did not have the authority to change the requirements identified by the operational command. In other words, the contracting arm merely translated the operational command's requirements into contractual terms and conditions.
Relatedly, during KBR's performance of the contract, the military had several methods of evaluating and controlling KBR. DCMA conducted real-time inspections and quality assurance audits. If KBR failed to meet the commander's intent, the military and KBR could informally address the deficiencies. The military also possessed formal methods including the issuance of formal directives to take corrective actions. Because LOGCAP III was a performance-based contract, KBR received its fee upon the government's evaluation of its work. Accordingly, the military evaluated *258 KBR's performance through semi-annual award fee evaluation boards consisting of both contracting and operational military personnel.
4.
Lastly, the district court found that "KBR was integrated into the military's chain of command and its waste and water services were essential to the military's mission." Burn Pit IV , 268 F.Supp.3d at 809. The district court first acknowledged that "the military commanders retained no direct command authority over KBR employees." Id. Although the military commanders could not issue direct orders to KBR, the district court relied on various witness and deposition testimonies to find that the military "retained authority and control over KBR's provision of waste and water services, and KBR was integrated into the military mission and chain of command." Id.
In making these findings, the court first cited to General Sanchez's testimony that "there were directives that were issued that required KBR to comply," and that KBR "could not make decisions unilaterally ... without coordinating and integrating with the military." Id. (quoting J.A. 4880); see also J.A. 812 (Dep't of the Army Pamphlet 715-16, Contractor Deployment Guide , stating that "[c]ontractor employees will be expected to adhere to all guidance and obey all instructions and general orders issued by the Theater Commander or his/her representative."). The district court further relied on the deposition testimony of Sari Berman, a former KBR employee, stating that KBR was "functionally under [military] command." Burn Pit IV , 268 F.Supp.3d at 809 (alteration in original) (citing J.A. 1343). Berman's testimony further revealed that KBR participated in the military's weekly primary staff briefings, daily battle update briefings, monthly maintenance meetings, and command briefs. The record contains General Sanchez's written declaration, explaining that "KBR's integration into the command and control structures allowed the military to exercise the necessary levels of control over the entire logistics chain supporting its operations." J.A. 908.
* * *
Based on the extensive facts that it found regarding KBR's provision of waste management and water services, the military's contracting process, and KBR's integration into the military chain of command, the district court reached two holdings. First, the district court held that the Servicemembers' suit presented a political question and granted KBR's motion to dismiss for lack of subject matter jurisdiction. Second, the district court held that the FTCA preempted the Servicemembers' state law claims and granted summary judgment in KBR's favor.
II.
"We review the district court's factual findings with respect to jurisdiction for clear error and the legal conclusion that flows therefrom de novo." Scott v. Cricket Commc'n , 865 F.3d 189, 194 (4th Cir. 2017) (internal quotation marks omitted). "The clearly erroneous standard is a demanding one. We may not simply overturn a lower court's determination because we would reach a different conclusion." In re Bate Land & Timber LLC , 877 F.3d 188, 198 (4th Cir. 2017). "[A] finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, N.C. , 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (internal quotation marks omitted). "If the district court's account of the evidence is plausible *259 in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." United States v. Wooden , 887 F.3d 591, 602 (4th Cir. 2018) (internal quotation marks omitted). In addition, "[w]e review a district court's grant of summary judgment de novo." Variety Stores, Inc. v. Wal-Mart Stores, Inc. , 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted).
III.
A.
Under Article III of the Constitution, "[t]he judicial power of the United States" extends to all cases arising under the Constitution and the laws of the United States. U.S. Const. art. III. The vesting of the judicial power in federal courts creates their emphatic duty "to say what the law is." Marbury v. Madison , 5 U.S. (1 Cranch) 137, 170, 177, 2 L.Ed. 60 (1803). Thus, federal courts have "a responsibility to decide cases properly before [them], even those [they] 'would gladly avoid.' " Zivotofsky ex rel. Zivotofsky v. Clinton , 566 U.S. 189, 194-95, 132 S.Ct. 1421, 182 L.Ed.2d 423 (2012) (quoting Cohens v. Virginia , 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821) ).
Even so, the Supreme Court has long recognized "a narrow exception" to the federal courts' duty and responsibility to decide cases, known as the political question doctrine. Id. at 195, 132 S.Ct. 1421. A case or controversy "involves a political question-where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.' " Nixon v. United States , 506 U.S. 224, 228, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (quoting Baker v. Carr , 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ). Federal courts will not examine cases involving a political question because doing so would encroach on the constitutional prerogatives of Congress and the President and because they are ill-equipped to decide these cases. See Baker , 369 U.S. at 217, 82 S.Ct. 691. In other words, the Constitution commits political questions to be resolved within "the halls of Congress or the confines of the Executive Branch," not on the steps of a federal courthouse. Japan Whaling , 478 U.S. at 230, 106 S.Ct. 2860 ; see also Marbury, 5 U.S. at 170 ("Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.").
"[M]ost military decisions are matters solely within the purview of the executive branch." Al Shimari v. CACI Premier Tech., Inc. , 758 F.3d 516, 533 (4th Cir. 2014) (" Al Shimari III ") (internal quotation marks omitted). Whereas the Constitution confers authority over military affairs in Congress and designates the President as Commander in Chief, U.S. Const. art. I, § 8; art. II, § 2, "[i]t contemplates no comparable role for the judiciary," and "judicial review of military decisions would stray from the traditional subjects of judicial competence," Lebron v. Rumsfeld , 670 F.3d 540, 548 (4th Cir. 2012). Given the unprecedented levels at which today's military relies on contractors to support its mission, however, this Court has recognized that a military contractor acting under military orders can also invoke the political question doctrine as a shield under certain circumstances. See Taylor , 658 F.3d at 411. Accordingly, when we are asked to review a military contractor's actions, we inquire whether such a review would lead to scrutinizing military decisions for which we lack the constitutional *260 warrant and judicial competence. Under this Court's decision in Taylor , a suit against a military contractor raises a nonjusticiable political question if either (1) the military exercised direct control over the contractor, or (2) "national defense interests were closely intertwined with the military's decisions regarding [the contractor's] conduct." Id . A case must be dismissed as nonjusticiable if either of these factors is met. Burn Pit III , 744 F.3d at 335.
B.
1.
Under the first Taylor factor, a suit against a military contractor presents a political question if the military exercised direct control over the contractor. Al Shimari v. CACI Premier Tech., Inc. , 840 F.3d 147, 156 (4th Cir. 2016) (" Al Shimari IV "). To qualify as direct control, the military's control over the government contractor must be plenary, Burn Pit III , 744 F.3d at 338 (quoting Carmichael v. Kellogg, Brown & Root Servs., Inc. , 572 F.3d 1271, 1276 (11th Cir. 2009) ), and actual, Al Shimari IV , 840 F.3d at 156.
To determine whether the military's control is plenary, "a court must inquire whether the military clearly chose how to carry out [the contractor's activities], rather than giving the contractor discretion to determine the manner in which the contractual duties would be performed." Al Shimari III , 758 F.3d at 534 (internal quotation marks omitted). The military's control over the government contractor must rise "to the level of the military's control over the convoy in Carmichael ." Burn Pit III , 744 F.3d at 338. In Carmichael , 572 F.3d at 1275, a military convoy-including fuel trucks being driven by KBR employees-was on a fuel resupply mission. During the mission, one of the trucks rolled over, threw Sergeant Carmichael out of the truck, and pinned him down, leaving him in a permanent vegetative state. Id. at 1278. In dismissing the suit, the Eleventh Circuit held that the military's control was plenary, because "the military decided the particular date and time for the convoy's departure; the speed at which the convoy was to travel; the decision to travel along a particular route ...; how much fuel was to be transported; the number of trucks necessary for the task; the speed at which the vehicles would travel; the distance to be maintained between vehicles; and the security measures that were to be taken." Id. at 1281 ; see also Burn Pit III , 744 F.3d at 338.
But the military's control is not plenary if the military "merely provides the contractor with general guidelines that can be satisfied at the contractor's discretion ...." Burn Pit III , 744 F.3d at 338 (quoting Harris v. Kellogg, Brown & Root Servs., Inc. , 724 F.3d 458, 467 (3d Cir. 2013) ). For example, in Taylor , 658 F.3d at 404, a Marine who was working on a broken power generator at a tank maintenance ramp suffered severe injuries when a KBR technician turned on the generator without confirming that the work was complete. This Court concluded that the military's control over the contractor was not plenary, because the military had contractually assigned all responsibility for safety and supervision to KBR, and "KBR was nearly insulated from direct military control ...." Id. at 411. Similarly, in Harris , 724 F.3d at 463, a soldier was electrified to death in the shower because of a water pump that was, allegedly, negligently installed and maintained. The Third Circuit concluded that the military's control over KBR was not plenary because of KBR's "significant discretion over how to complete authorized work orders," "the lack of *261 detailed instructions in the work orders," and "the lack of military involvement in completing authorized work orders." Id. at 467.
In addition to this framework, this Court in Al Shimari IV explained that the military's control must also be actual. See 840 F.3d at 156-57. In Al Shimari IV , the military, at least on paper, had vast control over the contractors at the Abu Ghraib prison in Iraq where the U.S. military held detainees. Id. For example, the contractor fell within the official military command structure, and the military established interrogation rules of engagement and approved interrogation plans. See id. But based on the Executive Branch's investigative findings that Abu Ghraib was "plagued by a lack of an organizational chain of command presence and by a lack of proper actions to establish standards and training," this Court concluded that the military lacked actual control over the contractors. Id. at 156. "[F]ormal command authority ... did not translate into actual control of day-to-day interrogation operations." Id. The Al Shimari IV court also held that the contractor must be engaged in "a lawful action under the actual control of the military," because "the military cannot lawfully exercise its authority by directing a contractor to engage in unlawful activity." Id. at 157. In sum, this Court would lack jurisdiction to entertain the Servicemembers' suit if the military's control over KBR was plenary and actual.
2.
Applying these principles, we conclude that the military's control over KBR was plenary and actual. First, the military's control was plenary as it not only directed to KBR "what" must be done but also prescribed "how" KBR must accomplish those tasks. See Al Shimari III , 758 F.3d at 534 ; Burn Pit III , 744 F.3d at 338-39. Under the LOGCAP III contract, the military contracted with KBR to provide waste management and water services. The facts found by the district court plainly show that KBR had little to no discretion in choosing how to manage the waste. The military mandated the use of burn pits as a matter of military judgment. KBR could not unilaterally choose to use landfills, recycling, or incinerators instead. Additionally, the military exercised plenary control over where to construct the burn pits, what could or could not be burned, when KBR could operate the burn pits, how high the flames should be, and how large each burn should be.
With regard to water services, KBR similarly had little discretion to choose how to provide potable water. KBR could not unilaterally bring bottled water from outside of Iraq, as it depended on the military supply chain to transport anything. As the evidence showed, the military directed the frequency and quantity of potable water to be produced and dictated how much should be stored. The fact that KBR lacked discretion differentiates this case from Taylor and Harris , where the military's control was not plenary because the contractors retained significant discretion, but makes it similar to Carmichael , 572 F.3d at 1282, in which "[e]ach of the[ ] critical determinations was made exclusively by the military." We conclude that the military's control over KBR's waste management and water services was plenary.
Next, the military's control over KBR was actual. See Al Shimari IV , 840 F.3d at 156-57. Unlike Al Shimari IV , this was not a case involving merely on-paper military control that was plagued by a lack of actual command presence. Although KBR did not officially fall within the military chain of command, the military exercised extensive control and oversight *262 over KBR's burn pit operations and water services. Operationally, the commanders and their staff officers interfaced with KBR contractors on a regular basis. The operational command determined the methods of waste management and water services that KBR was to use, dictated their requirements for support, and directed KBR to provide the necessary services through the contracting arm. The military also retained the ultimate responsibility for testing water quality. Furthermore, the military continuously and meticulously evaluated whether KBR was meeting the commanders' intent. Accordingly, we conclude that the military's control over KBR's waste management and water services was actual and plenary.
3.
The Servicemembers raise numerous unpersuasive arguments as to why the military lacked control over KBR. First, the Servicemembers argue that the district court clearly erred in finding that the military authorized KBR to utilize burn pits across Iraq and Afghanistan. To support this argument, the Servicemembers note that pursuant to LOGCAP III, KBR could not use burn pits without written authorization. Because the record only contains written authorization for burn pits at 18 locations, the Servicemembers argue that KBR therefore did not have authorization for every burn pit. We reject this argument. The district court's factual findings regarding the authorization of the use of burn pits is compelling in light of the entire record, easily surpassing the requirement that we uphold the finding so long as it is simply "plausible." Wooden , 887 F.3d at 602 (internal quotation marks omitted). The record overwhelmingly shows that the military not only authorized but mandated the use of burn pits.
In a written declaration, the Servicemembers' own witness, Lieutenant Colonel Damon Walsh, stated that "it is highly improbable that KBR could have located, constructed, and/or operated an enduring burn pit without the awareness and authorization of the military units." J.A. 1077. Likewise, David Palmer, a KBR employee, testified at deposition that he was not "aware of any instances where KBR operated a burn pit without the government's knowledge." J.A. 998. And Matthew Hersch, the military's quality assurance representative, testified that, "in [his] experience at Camp Bucca," there were no "instances where contractors were performing unauthorized work." J.A. 4982-83. Thus, the district court's conclusions that the military decided, authorized, and mandated the use of burn pits at all FOBs and that there were no instances of unauthorized use of burn pits are well supported by the record evidence. In other words, regarding the district court's finding that the military authorized KBR to use burn pits, the Servicemembers fail to leave a "definite and firm conviction that a mistake has been committed." Anderson , 470 U.S. at 573, 105 S.Ct. 1504 (internal quotation marks omitted).
Second, the Servicemembers argue that the district court clearly erred in finding that the military exercised any control over KBR because the military-or at least its operational command-cannot directly issue an order to KBR. They argue that only the military's contracting arm could direct KBR through contractual agreements, thus subjecting KBR not to military control but to contractual obligations. This argument is factually and legally unavailing. Factually, though the most immediate control over KBR came from DCMA, DCMA acted at the behest of the operational command. Although part of a separate chain of command, DCMA did not have its own separate mission *263 apart from the operational command; rather, its mission was to support the operational command. This is clear from the fact that DCMA did not have the authority to change the substance of the operational command's requirements. Therefore, we agree with the district court's conclusion that it is "irrelevant here that the military's operational commanders ... effectuated [their] orders by using DCMA (which is part of the military) as a conduit." Burn Pit IV , 268 F.Supp.3d at 814. Furthermore, as the Army's Contractor Deployment Guide shows, "[c]ontractor employees [were] expected to adhere to all guidance and obey all instructions and general orders issued by the Theater Commander or his/her representative." J.A. 812.
Moreover, the Servicemembers' argument is one that places form over substance. Cf. Al Shimari IV , 840 F.3d at 157 (noting that, although the military had formal control over the contractor's interrogation tactics, the inquiry turns on "what actually occurred in practice during those interrogations" (emphasis added)). The Servicemembers ask us to abstractly look only to the formal, contractual relationship between the military and KBR while ignoring the actual, operational relationship between them. We decline to do so.[5]
Third, the Servicemembers argue that the district court's findings regarding the military's control are clearly erroneous because there is evidence of KBR burning hazardous material, despite the military's prohibition against burning such material, thus showing the military did not actually control KBR. This argument has both factual and legal dimensions. Factually, the Servicemembers maintain that the district court's finding of control was clearly erroneous. Legally, the Servicemembers similarly argue that "KBR's repeated violations show a lack of military control over KBR," just like the lack of control in Al Shimari IV . Appellant Br. 39-40. We reject this argument on both fronts. Factually, the district court found the allegations that KBR burned hazardous material "vague [and] non-specific" and insufficient to "negate the conclusion that the military retained control." Burn Pit IV , 268 F.Supp.3d at 806. We find no clear error in that finding. And legally, a few instances of non-specific allegations do not amount to the type of systematic failure of oversight and lack of command presence found in Al Shimari IV . In Al Shimari IV , there were extensive findings of systematic violations at Abu Ghraib by the Executive Branch. Here, the Servicemembers make only vague allegations.[6]
*264 For these reasons, we conclude that the district court did not err in determining that the first Taylor factor is satisfied. The military's control over KBR was plenary and actual, making KBR's decisions pertaining to waste management and water services "de facto military decisions" unreviewable by this Court. Taylor , 658 F.3d at 410. Therefore, we agree with the district court that the political question doctrine bars the Servicemembers' suit. Because the first Taylor factor requires dismissal, we need not discuss the second Taylor factor and decline to do so. See Burn Pit III , 744 F.3d at 335.
IV.
Because this case is nonjusticiable under the first Taylor factor, we believe that the proper disposition is to affirm the dismissal and to vacate the portion of the district court's opinion discussing the FTCA issue. The FTCA waives the United States' sovereign immunity in certain tort cases. 28 U.S.C. § 2674. But under the FTCA's combatant activities exception, the United States remains immune from "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). As relevant here, the combatant activities exception preempts state tort claims against contractors if "a private service contractor is integrated into combatant activities over which the military retains command authority." Burn Pit III , 744 F.3d at 351 (quoting Saleh v. Titan Corp. , 580 F.3d 1, 9 (D.C. Cir. 2009) ). Below, the district court concluded that KBR's activities were integrated into the military's combatant activities. Therefore, the district court held that the FTCA's combatant activities exception preempted the Servicemembers' claims.
As we observed in Taylor , 658 F.3d at 412, "because we agree with the district court that the political question doctrine applies here, the second appellate issue-whether [the Servicemembers' claims are] preempted by the FTCA's combat[ant] activities exception-is rendered moot." We decline to review the district court's analysis of the FTCA issue, because the result "would be little more than an advisory opinion ...." Id. Mindful of our duty to decide only cases and controversies, we will not "stray into the practice of advisory opinion-making, solving questions that do not actually require answering in order to resolve the matters before [us]." Karsten v. Kaiser Found. Health Plan of Mid-Atl. States, Inc. , 36 F.3d 8, 11 (4th Cir. 1994) (per curiam). Additionally, we have explained that, in these circumstances, the "customary practice ... is to vacate the moot aspects of the lower court's judgment." Norfolk S. Ry. Co. v. City of Alexandria , 608 F.3d 150, 161 (4th Cir. 2010). Accordingly, we are "obliged to vacate the FTCA ruling, which constitutes the moot aspect of the district court's judgment." Taylor , 658 F.3d at 412.
V.
For the foregoing reasons, the judgment of the district court is
AFFIRMED IN PART AND VACATED IN PART.

Many of these cases are purported class actions on behalf of hundreds of thousands of military personnel and civilian contractors.

The district court had denied KBR's initial motion to dismiss. In re KBR, Inc., Burn Pit Litig. , 736 F.Supp.2d 954 (D. Md. 2010) ("Burn Pit I ").

On remand, the district court expressly excluded the question of derivative sovereign immunity from discovery, and later similarly declined to rule on this issue. See J.A. 332; Burn Pit IV , 268 F.Supp.3d at 786 n.5.

Under the relevant acquisitions practices, LOTDs are contractual documents that "order[ ] [contractors] to initiate performance of the requirements set forth in the task order[s]." J.A. 1074.

Relatedly, the Servicemembers argue that this case is akin to Taylor , in which the military lacked plenary control because it had contractually assigned the responsibility of supervision to KBR. See 658 F.3d at 411. In the Servicemembers' view, because the language of LOGCAP III and the contract in Taylor is identical, the military's control over KBR in this case would similarly not be plenary. We reject this argument. As noted, Al Shimari IV , 840 F.3d at 156-57, requires us to examine what actually happened rather than looking to the formal contractual relationship alone. Given the fact that the military directed KBR's waste management and water services in an extensive and detailed manner, we cannot say that "KBR was nearly insulated from direct military control." Taylor , 658 F.3d at 411.

The Servicemembers also allege that DCMA was understaffed and poorly trained such that it could not have effectively supervised KBR, thus lacking actual control. We reject this argument, as the district court's contrary conclusion is well supported by the evidence, and the Servicemembers offer comparatively little evidentiary support for this allegation. As such, they cannot prevail under clear error review.