# United States Court of Appeals
# for the Fifth Circuit

No. 20-30552

United States Court of Appeals
Fifth Circuit

**FILED**
June 30, 2021

Lyle W. Cayce
Clerk

Taylor Energy Company, L.L.C.,

*Plaintiff*,

*versus*

Kristi M. Luttrell Captain, in her official capacity as
Federal On-Scene Coordinator for the MC20 Unified
Command; et al.,

*Defendant*,

-------------------------------

Taylor Energy Company, L.L.C.,

*Plaintiff—Appellant*,

*versus*

Couvillion Group, L.L.C.,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:18-CV-14046 C/W No. 2:18-CV-14051

No. 20-30552

Before Smith, Stewart, and Ho, *Circuit Judges*.

Carl E. Stewart, *Circuit Judge*:

Taylor Energy Company, L.L.C. ("Taylor") seeks reversal of the summary judgment for Couvillion Group, L.L.C. ("Couvillion"). We AFFIRM.

## I. Factual and Procedural History

Taylor leased and operated oil wells and production platforms including a platform in the Mississippi Canyon Block 20 Area. The area is located approximately ten miles offshore from the Louisiana coast at the mouth of the Mississippi River. Through 2008, Taylor leased and operated the MC20 Platform, wells, and associated facilities.

In September 2004, Hurricane Ivan hit the Gulf Coast and caused a massive seafloor collapse, toppling the MC20 platform and jacket. The collapse buried the MC20 wells, and oil leaked across the ocean floor and surface for more than sixteen years ("the MC20 Incident").

Taylor responded to the MC20 Incident and notified the Coast Guard of the platform's fall. The Coast Guard designated Taylor as the "Responsible Party" under the Oil Pollution Act of 1990. Taylor was also added to the Unified Command group, which was established to respond to the MC20 Incident and monitor the MC20 Site.

After an oil spill, the Clean Water Act ("CWA") requires a federal official to be designated the "On-Scene Coordinator." 33 U.S.C. § 1321(d)(2)(K). If a spill "poses or may present a substantial threat to public health or welfare of the United States," the On-Scene Coordinator "shall direct all federal, state, or private actions to remove the discharge, as appropriate." 40 C.F.R. § 300.322(b). Captain Kristi Luttrell of the Coast Guard served as the On-Scene Coordinator for the MC20 Response.

After consulting with multiple government authorities and the Coast Guard, Taylor successfully drilled nine intervention wells to seal and reduce

the oil leak. For over a decade, Taylor and the Coast Guard worked together to respond to the MC20 Incident and monitor the remaining wells. Taylor spent more than $480 million to address the MC20 Incident.

In October 2018, the Washington Post published an article about the MC20 Incident that negatively described Taylor and its remediation efforts. On October 23, 2018, the Coast Guard rescinded its previous administrative order with Taylor after determining that some wells were actively discharging and that hundreds of barrels were discharged each day. The Coast Guard issued a new administrative order that required Taylor to instate a containment system to capture, contain, and remove oil from the erosional pit near the former Dome C location. The new order warned that a failure to comply could lead to the Government's full or partial assumption of the remediation efforts.

In November 2018, Taylor submitted proposals pitching itself as a potential contractor to install the containment system. Captain Luttrell also solicited proposals from other contactors, including Couvillion. Captain Luttrell selected Couvillion over Taylor, citing Taylor's previous failed efforts at containment. When selecting Couvillion, Luttrell issued a Notice of Federal Assumption, which meant that the Coast Guard would work directly with Couvillion to install the containment system and Taylor would be on the hook for the bill.

Couvillion entered into a Basic Ordering Agreement with the Coast Guard. The agreement requires Couvillion to provide "[l]abor, [e]quipment, and materials to contain, cleanup, and/or mitigate the harmful effects of oil spills and hazardous substance incidents." The Coast Guard also issued Authorization to Proceed Letters from November 2019 through April 2019 that authorized Couvillion to "proceed with work as ordered by the Federal On-Scene Coordinator . . . ." The Statement of Work provides goals and

tasks for Couvillion to propose and accomplish with the approval of the On-Scene Coordinator.

Captain Luttrell issued several memoranda that describe the Government's oversight of Couvillion's work. She described the meetings where various Government officials received progress reports on Couvillion's progress. In particular, she assigned several personnel to oversee different parts of the project, and Coast Guard teams were available to consult and provide their expertise. Her documents and memoranda indicate where she approved and monitored Couvillion's progress.

Despite the evidence of Captain Luttrell's and the Coast Guard's involvement with Couvillion, Taylor argues that the Government did not actually exercise control over the project. According to Taylor, Couvillion's contract with the Coast Guard lacks details and gives Couvillion leeway in deciding how to run the capture and cleanup operation. Taylor concludes that the "barebones contract" and lack of oversight by the Coast Guard allowed Couvillion to charge more than $40 million for its services (despite Couvillion's proposal estimate that the work would cost no more than $3 million). Taylor filed a notice to vacate the Coast Guard's Administrative Order and all actions taken under it, including the Notice of Assumption and the agreement with Couvillion.

At issue in this appeal is Taylor's Declaratory Judgment Action against Couvillion.[1] No contractual relationship exists between Taylor and Couvillion, but Taylor seeks tort damages and equitable relief for Couvillion's trespass and "unauthorized activities at the MC20 Site."

---

[1] Taylor filed a separate suit (now consolidated with this appeal) against Captain Luttrell and the Coast Guard, arguing that the Administrative Orders violated the Administrative Procedure Act and its right to due process.

No. 20-30552

Couvillion moved to dismiss on several grounds, including lack of subject-matter jurisdiction because it is a government contractor. The court denied Couvillion's Motion to Dismiss and ordered limited discovery on the jurisdictional issue. After discovery, Couvillion moved for summary judgment on two grounds: (1) because it was entitled to immunity under *Yearsley v. W.A. Ross Construction Company*, 309 U.S. 18 (1940), and (2) because Taylor's claims were preempted. The district court granted Couvillion's motion for summary judgment, concluding that Couvillion was immune under *Yearsley*. This appeal follows.

## II. STANDARD OF REVIEW

"We review a district court's grant of summary judgment de novo, applying the same standard as the district court." *Fairmont Cash Mgmt. L.L.C. v. James*, 858 F.3d 356, 360 (5th Cir. 2017). Summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting FED. R. CIV. P. 56(a)).

*Yearsley* immunity is an affirmative defense, and Couvillion bore the burden of proof on the defense at trial. Accordingly, Couvillion must have demonstrated that there were no material factual disputes about whether the Coast Guard authorized and directed Couvillion's work. *See Rizzo v. Children's World Learning Ctrs.*, 84 F.3d 758, 762 (5th Cir. 1996).

## III. DISCUSSION

The district court determined that Couvillion was entitled to *Yearsley* immunity and granted Couvillion's motion for summary judgment. In *Yearsley*, a group of plaintiffs sued a contractor after the contractor extended a river dike near the plaintiffs' land and hastened the land's erosion. 309 U.S. at 19–20. The contractor defended itself on the grounds that its work was authorized and directed by the Government of the United States. *Id.* at 20.

The Court agreed and held that where "it is clear that [] authority to carry out [a] project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." *Id.* at 20–21.

*Yearsley* immunity is "derivative sovereign immunity." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016). Such immunity shields contractors whose work was "authorized and directed by the Government of the United States" and "performed pursuant to [an] Act of Congress." *Id.* at 167 (quoting *Yearsley*, 309 U.S. at 20).

In Taylor's view, Couvillion is not entitled to *Yearsley* immunity for two reasons: (1) because Couvillion's actions were not authorized and directed by the Government, and (2) because Couvillion exceeded the bounds of the Coast Guard's authority under federal law. Neither argument prevails.

## A. Authorized and Directed

Taylor argues that there were material factual disputes about whether the Government authorized and directed Couvillion's work. Taylor points to the documents memorializing Couvillion's agreement with the Government and Couvillion's representative's deposition testimony, contending that the evidence demonstrates the Government's lack of control over Couvillion.

For actions to be authorized and directed by the Government, the contractor's actions should comply with federal directives. *See Campbell-Ewald Co.*, 577 U.S. at 167 n.7.

The Government's directives to Couvillion are contained in three sets of documents—the Basic Ordering Agreement, Authorizations to Proceed, and the Statement of Work. Taylor argues that the documents lack specificity

and thus indicate that the Government neither authorized nor directed Couvillion's actions.

The Statement of Work refutes Taylor's argument. The Statement of Work describes the MC20 Incident, the MC20 Site, and the conditions surrounding the site like water depth and currents, condition of the seafloor, and the location of the fallen jackets. The Statement of Work says "[t]he purpose of this effort is [to] eliminate the surface sheen at Mississippi Canyon Block 20 (MC20)."

The Statement of Work details the expectations of Couvillion and its subcontractors. It lists nine tasks and eleven deliverables (to be completed at various checkpoints during the life of the agreement). Tasks included, *inter alia*, mobilizing to create an MC20 Containment Project Management Plan, developing and implementing a Rapid Response Solution containment design, and working with the Source Control Support Coordinator and Branch Director to begin a review of relevant site data. The corresponding deliverables required Couvillion and the subcontractors to deliver the MC20 Containment Project Management Plan, to present the Rapid Response Solution containment design, and to complete an assessment report of possible sub-surface control response options. All deliverables were due within a set number of days from mobilization.

Given the specific expectations and due dates outlined in the Statement of Work, we agree with the district court's conclusion that there was no material factual dispute about the Government's authorization of and direction over Couvillion's work.

Taylor also argues that Couvillion's representative's deposition raised a genuine factual dispute. The representative testified that Couvillion (rather than the Coast Guard) designed various components of Couvillion's containment system.

Taylor misunderstands the *Yearsley* analysis. *Yearsley* did not focus on whether the Government designed the river dikes that led to the plaintiffs' injuries, but whether the contractor's work was "done pursuant to a contract with the United States Government, and under the direction of the Secretary of War and the supervision of the Chief of Engineers of the United States . . . ." 309 U.S. at 19. The appropriate inquiry is whether Couvillion adhered to the Government's instructions as described in the contract documents. *See In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014) ("[T]he contractor must adhere to the government's instructions to enjoy derivative sovereign immunity; staying within the thematic umbrella of the work that the government authorized is not enough to render the contractor's activities the act[s] of the government." (internal quotation marks omitted)).

There are no genuine factual disputes about Couvillion's adherence to the Government's directives. The Government directed Couvillion to come up with an MC20 site assessment procedure for the Rapid Response Solution containment project. The Government authorized Couvillion's plan, the design of the response system, and the installation of the system.

The representative's testimony supports this conclusion as well. He further testified that as designs and components changed throughout the life of the project, a Coast Guard officer and other Government officials (referred to as the "acceptance team") approved various components of Couvillion's design. The Coast Guard routinely met with Couvillion, and Couvillion went to the Coast Guard for approval before taking the next steps in the project.

To the extent that Taylor argues that the Government could not have authorized and directed Couvillion because Couvillion failed to fully remove the oil sheen, we also disagree. The Statement of Work says that the "purpose of this effort is [to] eliminate the surface sheen at Mississippi Canyon Block 20 (MC20)." Couvillion's actions eliminated at least some of

the sheen, and this evidence does not create a genuine fact dispute as to whether the Government authorized and directed Couvillion's work.

### B. Validly Conferred Authority from Congress

The second prong of *Yearsley* immunity requires a contractor's authority to be validly conferred by Congress. *See Yearsley*, 309 U.S. at 20–21. ("[A]uthority to carry out the project was validly conferred . . . if what was done was within the constitutional power of Congress."). Thus, we ask whether the On-Scene Coordinator's delegation of work to Couvillion was valid. If not, then Couvillion's actions are not immunized under *Yearsley*. *See Cunningham v. Gen. Dynamics Info. Tech., Inc.,* 888 F.3d 640, 648 (4th Cir. 2018) (explaining, in a suit against a contractor under the Telephone Consumer Protection Act, that "[t]he question is not whether informing applicants of their enrollment eligibility violated the [TCPA], but rather whether Congress had the authority to assign [the contractor] to complete that task.").

Taylor argues that the On-Scene Coordinator did not have authority to hire Couvillion. Relevant here, 33 U.S.C. § 1321(c)(1)(B) permits the President to

(i)    remove or arrange for the removal of a discharge, and mitigate or prevent a substantial threat of a discharge, at any time;

(ii)   direct or monitor all Federal, State, and private actions to remove a discharge; and

(iii)  remove and, if necessary, destroy a vessel discharging, or threatening to discharge, by whatever means are available.

Further, 40 C.F.R. § 300.322(b) gives the On-Scene Coordinator similar abilities. Taylor maintains that Couvillion and the Coast Guard

No. 20-30552

exceeded the limits of federal law by trespassing on the MC20 jacket since neither the jacket nor the other MC20 components are "vessels."[2]

We disagree with Taylor's analysis of the relevant statutes. Section 300.322(b)(1) and (2) empower the On-Scene Coordinator to remove discharges and mitigate substantial threats of discharge.[3] When the Government contracted with Couvillion and Couvillion placed its containment system at the MC20 site, the site was either actively discharging or threatening to discharge. Couvillion's actions on behalf of the Government fit within the language of the relevant federal statutes. Thus, Couvillion's authority to carry out its actions was validly conferred by Congress.

## IV. CONCLUSION

For the aforementioned reasons, we AFFIRM the summary judgment.

---

[2] A vessel refers to "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water; and, as defined by section 311(a)(3) of the CWA, means every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water other than a public vessel." 40 C.F.R. § 300.5.

[3] Section 1321(c)(1)(B)(i) similarly empowers the President to remove discharges and mitigate substantial threats of discharge.